**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA

Plaintiff,

v.

DIEGO FERNÁNDEZ SANTOS,

Defendant.

CRIMINAL NO.: 23-063 (FAB)

**REPORT & RECOMMENDATION**

## I.   PROCEDURAL BACKGROUND

On February 23, 2023, a grand jury returned an indictment against Diego Fernández Santos ("Defendant") charging him with prohibited possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). ECF No. 8 at 1. Pending before the court is Defendant's motion to suppress. ECF No. 20. The United States of America ("the Government") subsequently filed a response in opposition to Defendant's motion to suppress to which, thereafter, Defendant replied. ECF Nos. 29, 36. Defendant seeks to suppress physical evidence secured from and around the home in which he lived (the "Residence") and the statements he made to Homeland Security Investigation Task Force Officers ("HSI TFOs"), arguing violations of both his Fourth and Fifth Amendment rights. ECF No. 75 at 2–3. Suppression hearings were held on August 15, 21, and 29. ECF Nos. 57, 65, 70. In light of newly discovered video footage depicting the execution of the arrest warrant, the suppression hearing was reopened on December 21, 2023. For the reasons set forth below, Defendant's motion to suppress should be GRANTED IN PART and DENIED IN PART.

## II.    FACTUAL BACKGROUND

On February 14, 2023, at approximately 3:00 a.m., the Puerto Rico Police Department ("PRPD") executed an arrest warrant at the Residence to arrest Defendant. Tr. (8/21/23) 12, ¶¶ 12–14; Tr. (8/21/23) 11, ¶¶ 1–11. PRPD's Special Arrest Unit, led by Sergeant Rafael Gómez Águila ("Sgt. Gómez Águila"), conducted a forced entry and began sweeping the Residence's first floor. Tr. (8/15/23) 53, ¶¶ 14–17; Tr. (8/15/23) 54, ¶¶ 2–11. Agent Luis Alexander Gómez ("Agent Gómez"), from the PRPD's Caguas Drugs Division, testified that right before the Special Arrest Team entered the Residence, he saw a silhouette of a person from one the Residence's second-floor windows, and Agent Gómez immediately began to move toward the Residence's backyard. Tr. (8/21/23) 15, ¶¶ 4–14; Tr. (8/21/23) 16, ¶¶ 10–16; Tr. (8/21/23) 17, ¶¶ 1–5. As Agent Gómez reached the back, he allegedly observed Defendant throw a black fanny pack from the Residence's back door approximately ten feet away.[1] Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/21/23) 22, ¶¶ 8–9. Agent Gómez further testified that, thereafter, Defendant supposedly went back into the Residence, and the black fanny pack remained untouched where it landed.[2] Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/21/23) 23, ¶¶ 15–25; Tr. (8/21/23) 24, ¶¶ 1–4.

After clearing the Residence's first floor, the Special Arrest Unit led by Sgt. Gómez Águila proceeded up the stairway to the second floor. Tr. (8/15/23) 55, ¶¶ 5–18. Eventually, both Defendant and his mother, the only occupants of the Residence, were arrested on the second floor. Tr. (8/15/23) 59, ¶¶ 11–17; Tr. (8/15/23) 61, ¶¶ 2–7. Afterwards, Sgt. Gómez Águila and

---

[1] The Residence's backdoor is on the second floor of the home and had direct access to the backyard. Tr. (8/21/23) 23, ¶¶ 1–14. Although the Residence has two levels, only the second floor has access to the backyard due to the structure of the Residence and its surrounding terrain. ECF Nos. 72-4–11.

[2] During the reopening of the suppression hearing on December 21, 2023, Defendant introduced video recorded evidence that puts into question Agent Gómez's credibility regarding, among other things, the account regarding the silhouette and Defendant being observed throwing a fanny pack to the backyard. Exhibit F (recording of PRPD's breach of Defendant's home). This will be discussed further in the analysis section of this report and recommendation.

his team started conducting a security sweep of the second floor. Tr. (8/15/23) 61, ¶¶ 2–7. While conducting the sweep, Sgt. Gómez Águila found what appeared to be a rifle in plain sight within a bedroom closet. Tr. (8/15/23) 62, ¶¶ 4–24.

Once the sweep of the second floor was completed, Sgt. Gómez Águila and his team left the second floor and notified officers from the Caguas Drugs Division that the Residence was clear. Tr. (8/15/23) 66, ¶¶ 19–25; Tr. (8/15/23) 67, ¶¶ 1–3. However, Sgt. Gómez Águila also notified Agent Gómez of the rifle found upstairs in the bedroom closet. Tr. (8/15/23) 67, ¶¶ 2–6. Subsequently, Sgt. Gómez Águila and Agent Gómez, among others, went upstairs, and Sgt. Gómez Águila showed Agent Gómez the closet where the rifle was located. Tr. (8/15/23) 67, ¶¶ 7–11.

As Agent Gómez began to observe and examine the rifle discovered by Sgt. Gómez Águila, Agent Gómez noticed the handle of another firearm protruding from a blue backpack. Tr. (8/21/23) 25, ¶¶ 18–25; Tr. (8/21/23) 26, ¶¶ 1–3; ECF Nos. 71-8-10. Agent Gómez proceeded to first check the rifle discovered by Sgt. Gómez Águila and determined it was not real. Tr. (8/21/23) 28, ¶¶ 6–19. Next, Agent Gómez checked the other firearm that was protruding from the blue bag and verified that it was real. Tr. (8/21/23) 28, ¶¶ 23–25; Tr. (8/21/23) 29, ¶¶ 1–3. Agent Gómez further testified that as he removed the rifle from the blue bag, he observed various types of ammunition within the bag. Tr. (8/21/23) 30, ¶¶ 2–5; Tr. (8/21/23) 31, ¶¶ 2–3. Shortly after, Agent Gómez read Defendant his *Miranda* rights which Defendant reacted to by remaining silent. Tr. (8/21/23) 29, ¶¶ 22–25; Tr. (8/21/23) 30, ¶ 1. Thereafter, Agent Gómez and Defendant, who was in custody, went through the backdoor to the backyard, toward the black fanny pack, which at that point had been on the ground for approximately 40 minutes. Tr. (8/21/23) 32, ¶¶ 12–22; Tr. (8/21/23) 33, ¶¶ 2–6; Tr. 8/21 23, ¶¶ 15–25; Tr. 8/21 24, ¶¶ 1–4.

3

Agent Gómez proceeded to open the bag before picking it up and found a firearm, ammunition, and two of Defendant's identification cards. Tr. (8/21/23) 33, ¶¶ 2–9; Tr. (8/21/23) 36, ¶¶ 20–25.

Several hours later, around mid-morning, on February 14, 2023, HSI TFOs Edwin Guzmán and Edwin Vázquez Malavé arrived at the Caguas Drug Division to interview Defendant. Tr. (8/15/23) 132–34. As the interview began, the HSI TFOs provided Defendant with a *Miranda* form (the "HSI *Miranda* Form"), Tr. (8/15/23) 114, ¶¶ 6–13. During that time, Agent Gómez entered the interview room and asked Defendant to sign a PRPD *Miranda* form (the "PRPD *Miranda* Form") to document the verbal *Miranda* warnings Agent Gómez gave to Defendant at the Residence. Tr. (8/15/23) 118, ¶¶ 10–24. Tr. (8/21/23) 43, ¶¶ 17–24. Defendant signed the PRPD *Miranda* Form explicitly noting that he did not waive his rights and signed the HSI *Miranda* Form indicating that he affirmatively waived his rights.[3] ECF No. 71-20 at 2; ECF No. 71-23 at 2. Both forms were dated February 14, 2023, at 1:50 p.m. ECF No. 71-20 at 2; ECF No. 71-23 at 2. After Defendant signed the PRPD *Miranda* Form, Agent Gómez left the interview room, and Defendant proceeded to talk to the HSI TFOs. Tr. (8/15/23) 119, ¶¶ 2–18; Tr. (8/21/23) 45, ¶¶ 1–9.

## III.   ANALYSIS

Defendant contends that his Fourth Amendment rights were violated when the PRPD engaged in a warrantless search of the Residence. ECF No. 75 at 5. The Government responded that the search of the Residence was valid under the following exceptions to the warrant requirement: search incident to arrest, the plain feel doctrine, and the inevitable discovery doctrine. ECF No. 29 at 4–10; ECF No. 74 at 6–8.

---

[3] It is unclear from the record which of the two *Miranda* forms was fully executed first.

Next, Defendant asserts that the statements made to the HSI TFOs violated his Fifth Amendment rights to remain silent and right to counsel. ECF No. 75 at 14. Specifically, Defendant claims that he invoked his right to counsel when he filled out the PRPD *Miranda* Form and marked the box indicating that he was not waiving his rights. ECF No. 75 at 14. Additionally, Defendant argues that the HSI TFOs did not scrupulously honor his right to remain silent. ECF No. 75 at 14. The Government disagrees on both points. ECF No. 29 at 10–13; ECF No. 74 at 8–10.

## A. Fourth Amendment Claim

Defendant asserts that the search of the Residence, including the search of the black fanny pack found in the backyard, violated the Fourth Amendment and that no exceptions to the warrant requirement exist to justify the search. ECF No. 75 at 5. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Davis v. United States*, 564 U.S. 229, 234–35 (2011). In analyzing reasonableness, a search "conducted outside the judicial process, without prior approval by judge or magistrate, [is] *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. at 338 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal quotations omitted)).

"[W]hen it comes to the Fourth Amendment, the home is first among equals. . . . and is where 'privacy expectations are most heightened.'" *Florida. v. Jardines*, 569 U.S. 1, 6–7 (2013) (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). This same protection is afforded to a home's curtilage, which is the "area around the home [that] is 'intimately linked to the home, both physically and psychologically.'" *Id.* at 7 (quoting *Ciraolo*, 476 U.S. at 213). If the prosecution seeks to justify the search of a home without a search warrant, it bears the burden of

5

establishing that an exception to the warrant requirement applies. *United States v. Jeffers*, 342 U.S. 48, 51. (1951) (citing *McDonald v. United States*, 335 U.S. 451, 456 (1948)).

Before proceeding, it is worth discussing precisely what physical evidence Defendant seeks to suppress under his Fourth Amendment claim. Because Defendant failed to specify all physical evidence he was seeking to suppress in his original motion to suppress, Defendant was given a final opportunity at the beginning of the suppression hearings to state on the record what physical evidence was sought to be suppressed. *Compare* ECF No. 20 at 5–10 (specifically seeking to suppress the black fanny pack found in the Residence's backyard), *with* ECF No. 39 (specifically seeking to suppress the black fanny pack *and a rifle* found in a bedroom closet); Tr. (8/15/23) 19–21. At the initial suppression hearing held on August 15, 2023, Defendant confirmed the following list of physical evidence to be suppressed from the search of the Residence: (1) the contents of a black fanny pack found in the Residence's backyard: (a) one firearm, (b) two ammunition magazines, and (c) two photo identification cards; and (2) contents found inside one of the Residence's bedroom closets: (a) one rifle and (b) ammunition. Tr. (8/15/23) 21, ¶¶ 2–21.

Now, Defendant, in his post-hearing brief, argues that a cell phone should also be suppressed. ECF No. 75 at 13. However, that request should be denied as untimely because Defendant was already given an opportunity at the beginning of the hearing to specifically address which items he sought to suppress. Tr. (8/15/23) 21, ¶¶ 2–21. Moreover, as previously explained on the August 15 suppression hearing, allowing Defendant to add items—after the initial motion to suppress has already been filed—does not provide the Government with adequate notice. Tr. (8/15/23) 16, ¶¶ 2–16. Before addressing the merits of Fourth Amendment claim, the issue of standing will be analyzed.

### 1.  Whether Defendant has standing under the Fourth Amendment.

Defendant argues that he has standing because he lived at the Residence. ECF No. 75 at 3–4. Because the Fourth Amendment only protects legitimate expectations of privacy, in moving to suppress evidence, a criminal defendant has the burden to establish standing by showing "that he had a reasonable expectation of privacy in the area searched and in relation to the items seized." *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988) (citing *United States v. Salvucci*, 448 U.S. 83, 90–92). The standing inquiry has two parts. First, the defendant must show that he subjectively thought that the place or item was private and treated it accordingly. *Id.* at 857. Once a defendant makes that showing, the court must examine whether the individual's expectation of privacy was objectively reasonable under the totality of the circumstances. *Id.*

Factors developed by the First Circuit to aid in the standing inquiry include ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. *United States v. Gómez*, 770 F.2d 251, 254 (1st Cir. 1985) (citing *United States v. Lochan*, 674 F.2d 960, 965 (1st Cir. 1982)). Defendant's burden of showing standing "must be carried at the time of the pretrial hearing and on the record compiled at that hearing." *Aguirre*, 839 F.2d at 856.

Defendant called U.S. Probation Officer Grace Moringlane ("USPO Moringlane") to testify regarding the issue of standing. Tr. (8/29/23) 65.[4] USPO Moringlane testified that she began supervising Defendant in May 2021 and has visited him at the Residence eight times

---

[4] To support his contention, Defendant also points to a declaration under penalty of perjury from his mother, stating that Defendant lived with her at the Residence. ECF No. 75 at 4. However, that document is excluded from the analysis because Defendant's mother did not testify at the hearing.

within the last two years, the last of which was two weeks before Defendant's arrest. Tr. (8/29/23) 67, ¶¶ 16–25. She further stated that, during her supervision of Defendant, he lived at the Residence with other family members, including his mother, and that Defendant had a bedroom there. Tr. (8/29/23) 68, ¶¶ 13–25. In addition to the testimony above, Defendant admitted evidence of a blueprint sketch of the Residence. Notably, this sketch, which was drawn by HSI TFO Vázquez based on information provided by Defendant, displays that Defendant had a bedroom in the Residence. Tr. (8/29/23) 86; Tr. (8/29/23) 87, ¶¶ 1–5; ECF No. 72-21 at 1. Finally, based on testimony from both Sgt. Gómez Águila and Agent Gómez, Defendant had personal items in the Residence and told the officers which room was his. Tr. (8/15/23) 97, ¶¶ 5–15; Tr. (8/29/23) 13, ¶¶ 18–25. Based on the uncontroverted evidence above, Defendant has met his burden to show standing.

First, Defendant has shown that he has a subjective expectation of privacy in the Residence and therefore the items seized within and around it. This is evidenced by the fact that he told his probation officer, the HSI TFOs, and PRPD officers that the Residence was his home and had a bedroom there. Tr. (8/15/23) 119, ¶¶ 7–9; Tr. (8/29/23) 68, ¶¶ 13–25. Second, this expectation of privacy was objectively reasonable under the circumstances because Defendant lived in the Residence for at least two 22 months before his arrest. Tr. (8/29/23) 67, ¶¶ 16–25. Viewed objectively, maintaining a bedroom, storing personal items, and living in the same home for 22 months creates a privacy interest that society would recognize as legitimate.

The Government opposes the issue of standing on two grounds. First, at the August 15, 2023, suppression hearing, the Government argued that the Residence was not his because it was not registered to Defendant. Tr. (8/15/23) 9, ¶¶ 9–20. However, home ownership is not necessary to establish standing. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990) (holding that an overnight

guest in home has standing in the areas she has permission to be in). For example, the Residence could be registered under Defendant's mother's name, and Defendant could be residing there with permission from the Residence's owner. Furthermore, USPO Moringlane's testimony suggests, albeit not explicitly, that Defendant was not a squatter. *See Amezquita v. Hernandez-Colon*, 518 F.2d 8, 12 (1st Cir. 1975) (holding that squatters could not assert standing on land in which they did not own).

Second, in its post-hearing brief, the Government argues that Defendant does not have standing to contest the physical evidence seized in the black fanny pack because Defendant failed to provide evidence that "the grassy area behind the rear of the house is curtilage that pertains to that residence." ECF No. 74 at 2. Therefore, the Government contends, "it could be an area of common use for all houses that face that grassy area." ECF No. 74 at 2. However, that showing was not necessary when the Government conceded the following at the beginning of the suppression hearing:

> *As far as the government understands, the area in which the fanny pack was thrown, that backyard*, what[] [is] called the backyard, *pertains to that house*, and so it was thrown from -- it was thrown from the house into the backyard that pertains to that house, *not to someone else's yard*.

Tr. (8/15/23) 6, ¶¶ 22–25; Tr. (8/15/23) 7, ¶¶ 1–2. Even so, on cross-examination Agent Gómez testified that the Residence's backyard was private property, not open to the public.[5] Tr. (8/29/23) 14, ¶¶ 9–20. Accordingly, Defendant has standing under the Fourth Amendment.

---

[5] The backyard of the Residence does not have a fence completely around its perimeter. ECF Nos. 72-3–10.

**2.   Whether the contents inside the black fanny pack be suppressed.**

The Government argues that three exceptions to the warrant requirement apply to justify the search of the black fanny pack found in the Residence's backyard: (1) search incident to arrest, (2) plain feel doctrine, and (3) the inevitable discovery doctrine. Because video recorded evidence partially contradicts Agent Gómez's testimony regarding the events surrounding the black fanny pack, Agent Gómez's credibility will first be assessed.

a.   <u>Agent Gómez's credibility determination.</u>

Here, the events surrounding the black fanny pack are not necessarily clear because Agent Gómez's testimony, the only testimony regarding this matter, is partially contradicted by video recorded evidence of the PRPD's breach of Defendant's Residence on February 14, 2023. According to Agent Gómez, immediately before the Special Arrest Team breached the Residence, he saw a silhouette of a person from one the Residence's second-floor windows, yelled "police," and moved toward the Residence's backyard. Tr. (8/21/23) 15, ¶¶ 4–14; Tr. (8/21/23) 17, ¶¶ 1–5. Agent Gómez further asserts that as he reached the back, he allegedly saw Defendant throw a black fanny pack from the Residence's back door approximately ten feet away. Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/21/23) 22, ¶¶ 8–9. Finally, Agent Gómez explained that, thereafter, Defendant went back into the Residence, and the black fanny pack remained untouched where it landed, under the uninterrupted watch of Agent Ángel Gotay ("Agent Gotay") for approximately 40 minutes until it was later opened. Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/21/23) 23, ¶¶ 15–25; Tr. (8/21/23) 24, ¶¶ 1–4.

However, Agent Gómez's account of the events are not entirely consistent with video recorded evidence showing the breach of Defendant's Residence. The first 26 seconds of the video footage captures the front of the Residence and the Special Arrest Team moving into

position to breach the front door. Defendant argues that Agent Gómez could not have seen a silhouette because the video does not capture it nor is there light in the window where Agent Gómez claimed to had seen someone. However, the video does not necessarily discredit Agent Gómez on this point because the video focuses only on the window for two seconds, consistent with the fact that the video did not capture what Agent Gómez saw, and there is enough illumination around the Residence to reasonably make out a figure in its window.[6] Exhibit F at 0:00–0:05. Next, Defendant argues that Agent Gómez's testimony is not credible regarding whether he yelled "police" after he allegedly saw a silhouette in the window. As discussed, the video's first 26 seconds depicts the Special Arrest Team slowly moving into position toward the Residence's front door. Exhibit F at 0:00–0:26. At no time is the word "police" heard in the video before the Special Arrest Team begins breaching. Exhibit F at 0:00–0:26. While it could be argued that Agent Gómez saw the silhouette and yelled "police" before the video began recording, this is highly unlikely given the Special Arrest Team's slow movement toward the front door. Had the PRPD known that individuals inside the home were already aware that police were outside, it is nonsensical that the Special Arrest Team would be moving slowly and risk a fleeing suspect. Therefore, this portion of Agent Gómez's testimony is not credible.

Defendant also challenges Agent Gómez's testimony regarding the sequence of events surrounding the black fanny pack generally, asserting that the video does not support Agent Gómez's testimony that he reached the Residence's backyard in a short amount of time and observed Defendant throw the bag. Specifically, Defendant points to the video's audio at approximately one minute where you can hear officers say, "to the floor! what's your name" and

---

[6] Agent Gómez did not testify that the internal lights of the Residence's second floor were on when he saw the silhouette.

"hands to the head! hands to the head," arguing that because Defendant was already in custody at this point, all the events regarding the black fanny pack per Agent Gómez's testimony, if true, would have already happened. Exhibit F at 1:00–1:02. Exhibit F1. Here, the video shows the Special Arrest Team begin its breach of the Residence at approximately 26 seconds and indicates that Defendant was apprehended at approximately one minute. Exhibit F at 0:26–1:02. This means that Agent Gómez had approximately 30 to 40 seconds to run to the backyard and see Defendant throw the bag. Contrary to Defendant's assertion, the video footage's timeline is reasonably consistent with Agent Gómez's testimony:

> Q [Defense Counsel] Okay, but I think just to be clear, I'm talking about from the time you arrived at the home to the time you saw [Defendant] throw the bag, how much time had passed?
>
> A [Agent Gómez] It wasn't a minute, about forty seconds, approximately.

Tr. (8/29/23) 19, ¶¶ 16–19. Defendant also points to the end of the video recording showing both Agent Gómez and Agent Gotay,[7] who reportedly accompanied Agent Gómez to the backyard, not looking visibly tired after allegedly sprinting to the backyard. While the terrain toward the backyard is certainly not flat, it is not inconceivable that both officers, who appear to be reasonably fit, would be able to make it to backyard within forty seconds and not appear to be noticeably exhausted afterward. ECF Nos. 72-4–11. Therefore, Agent Gómez's testimony regarding his timeline of reaching the backyard is not discredited by the video recording.

Finally, Defendant attacks Agent Gómez's testimony regarding Agent Gotay's role in watching the black fanny pack after it was allegedly thrown in the Residence's backyard:

> Q [Government] Now, after you observed the bag thrown to the ground, what happened?

---

[7] Both parties stipulated at the reopening of the suppression hearing that Agent Gómez (wearing blue shoes) and Agent Gotay (wearing a blue shirt) were the gentlemen shown at the end of the recording. Exhibit F at 1:24; Hr'g, December 21, 2023, at 10:04 a.m.

A [Agent Gómez] Fellow Officer Gotay is present and I say to Gotay, "Gotay, somebody just threw that purse, that bag. Stay here watching over it because I have to go and serve the arrest warrant and do my job."

Q What did Agent Gotay do?

A *He stayed at all moments watching over the bag.*

Q How long was that approximately?

A Until the serving of the arrest warrant was done.

Q Approximately how long did that take?

A For around forty minutes approximately.

Tr. (8/21/23) 23, ¶¶ 15–25 (emphasis added); Tr. (8/21/23) 24, ¶ 1. As discussed above, although the video recording does not capture what happened at the initial moments in the Residence's backyard, the video is certainly recording during the same time frame that those alleged events happened. Defendant points to the end of the video recording depicting Agent Gómez and Agent Gotay moving toward the front of the Residence, arguing that Agent Gómez's testimony regarding Agent Gotay watching over the bag after it was thrown is not credible. Exhibit F at 1:24–1:27. This part of the video recording clearly contradicts Agent Gómez's testimony when he said that Agent Gotay was always with the black fanny pack after it was thrown on the ground. It is noted that the video recording certainly shows that there is a problem with Agent Gómez's testimony, and Defendant argues that, as a result, none of his testimony should be credited. However, that is not necessary regarding his testimony surrounding the black fanny pack because even if all of Agent Gómez's account of the initial phase of the execution of the arrest warrant were true, it would still be recommended that the black fanny pack and its contents be suppressed.[8]

---

[8] Agent Gómez's credibility will continue to be assessed regarding other matters throughout this report and recommendation's analysis.

b.  <u>The search incident to arrest exception does not apply.</u>

The search incident to arrest exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant*, 556 U.S. at 338. In *Chimel v. California*, the United States Supreme Court held that the search incident to arrest exception applies only to items on "the arrestee's person and the area . . . in which [the arrestee] might gain possession of a weapon or destructible evidence." 395 U.S. 752, 763 (1969). A lawful search incident to arrest must be substantially contemporaneous with the arrest because of "the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime." *Id.* at 764.

Here, assuming all of Agent Gómez's testimony to be true, after being alerted of the PRPD's presence, Defendant threw the black fanny pack onto the curtilage of the Residence approximately ten feet from his person and returned inside. Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/21/23) 22, ¶¶ 8–9. Shortly thereafter, Defendant was arrested without resisting inside a hallway of the Residence on the second floor. Tr. (8/15/23) 59, ¶¶ 1–22. Nothing in the record shows that Defendant was within reaching distance of the black fanny pack when he was arrested by PRPD. Indeed, both Agent Gómez and Sgt. Gómez Águila testified that the black fanny pack was *not* within Defendant's reach when he was arrested. Tr. (8/15/23) 83, ¶¶ 16–23; Tr. (8/29/23) 32, ¶¶ 20–22. Finally, the black fanny pack was searched nearly 40 minutes after Defendant was arrested. Tr. 8/21 23, ¶¶ 15–25; Tr. 8/21 24, ¶¶ 1–4.

Again, the purpose behind this exception is to preserve evidence and protect the arresting officers. *Gant*, 556 U.S. at 338. Here, the record shows that neither of these purposes would be furthered when Defendant was arrested outside of reaching distance of the black fanny pack and the search took place nearly 40 minutes later. Tr. (8/15/23) 83, ¶¶ 16–23; Tr. (8/29/23) 32, ¶¶

20–22; Tr. 8/21 23, ¶¶ 15–25; Tr. 8/21 24, ¶¶ 1–4. Accordingly, the search incident to arrest exception does not apply.

The Government cites to *United States v. Dillard*, 78 F. App'x 505 (6th Cir. 2003) to further its argument. ECF No. 74 at 6. Nevertheless, contrary to the Government's argument, the facts of this case do not resemble *Dillard*. In *Dillard*, police were executing a search warrant of an apartment where Dillard had previously sold cocaine to an undercover officer. *Dillard*, 78 F. App'x at 507. Upon approaching the apartment, police saw Dillard, holding a briefcase, and another male exiting the residence from a side door. *Id*. Once Dillard was on the driveway, police alerted Dillard of their presence, and Dillard threw the briefcase on the ground, landing approximately four feet away from Dillard. *Id*. Dillard began resisting arrest and pulled out a 9mm gun from his waistband in an altercation that lasted forty-five seconds. *Id.* After placing Dillard under arrest, police opened the briefcase and discovered, among other things, cocaine and a weapon. *Id*. The Sixth Circuit Court held that the police were justified in searching Dillard's briefcase after the arrest because the search incident to arrest exception applied. *Id.* at 513. The appellate court reasoned that the search incident to arrest exception does not expire as soon as a suspect is arrested because exigent circumstances can still exist. *Id.* In other words, police can search areas within the immediate control of the suspect after the arrest is made. *Id.* The court further reasoned that

> [w]hen a container is within the immediate control of a subject at the beginning of an encounter with law enforcement officers[,] and when the officers search the container at the scene of the arrest[,] the Fourth Amendment does not prohibit a reasonable delay, such as the one in this case, between the elimination of the danger and the search.

*Id* (quoting *United States v. Han*, 74 F.3d 537, 543 (4th Cir. 1996)) (internal quotations omitted).

This case does not resemble *Dillard*. First, unlike Dillard, who threw the briefcase four feet, Defendant threw the black fanny pack ten feet. *Id.* at 507; Tr. (8/21/23) 22, ¶¶ 8–9. While an argument could be made that 10 feet is still in reaching distance, that would still ignore the fact that the bag was thrown *outside* the house when Defendant was arrested *inside*, making it more unlikely that Defendant could access the black fanny pack during his arrest. Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/15/23) 59, ¶¶ 1–22. Moreover, after throwing the black fanny pack, Defendant went back inside and was arrested in hallway of the second floor, even further than ten feet away from the bag. Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/15/23) 59, ¶¶ 1–22. Finally, unlike in *Dillard*, where police searched the briefcase after arresting Dillard in a violent altercation, Agent Gómez did not open the bag until approximately 40 minutes after Defendant's nonviolent arrest. Tr. (8/21/23) 23, ¶¶ 15–25; Tr. (8/21/23) 24, ¶¶ 1–4; Tr. (8/29/23) 32, ¶¶ 12–19; *Dillard*, 78 F. App'x at 507. Because this case is materially different than *Dillard*, the Government's reliance on *Dillard* is misguided. Accordingly, the search incident to arrest exception does not apply with respect to the black fanny pack found in the backyard.

### c.   The plain feel exception does not apply.

Next, the Government claims that search of the black fanny pack was justified under the plain feel doctrine. ECF No. 29 at 7. "[T]he plain feel doctrine permits an officer to seize an object, if its incriminating character is immediately apparent during a lawful protective pat-search." *United States v. Schiavo*, 29 F.3d 6 (1st Cir. 1994) (citing *Minnesota v.* Dickerson, 508 U.S. 366, 367 (1993). Here, however, the fanny pack was not on Defendant's person when it was seized by the law enforcement agents. Therefore, this was not a pat down or frisk search. Furthermore, Agent Gómez testified that he opened the fanny pack *before* lifting it: "[Defendant] was already under custody and once we went outside, I went upstairs to pick up the bag. *Before*

*picking it up, I opened it for my safety*, [Defendant]'s[,] and everybody that was present." Tr.

(8/21/23) 33, ¶¶ 2–9 (emphasis added). No testimony was introduced at the hearing about a law

enforcement agent touching different parts of the fanny pack or grabbing it to feel whatever was

inside before opening it. Accordingly, the plain feel exception does not apply.

d.  The inevitable discovery doctrine does not apply.

Finally, the Government argues that the search of the black fanny pack was justified

under the inevitable discovery doctrine and the inventory search exception to the warrant

requirement. ECF No. 36 at 7. The inevitable discovery doctrine permits evidence acquired

through unlawful means to be admitted if the "prosecution can show by a preponderance of the

evidence that the government would have discovered the challenged evidence even had the

constitutional violation to which the defendant objects never occurred." *United States v. Scott*,

270 F.3d 30, 42 (1st Cir. 2001) (citing *Nix v. Williams*, 467 U.S. 431, 440–48 (1984). The First

Circuit has identified a three-part test for applying the inevitable discovery exception:

> first, whether the legal means [are] truly independent; second, whether both the use
> of the legal means and the discovery by that means are truly inevitable; and, third,
> whether the application of the inevitable discovery exception either provides an
> incentive for police misconduct or significantly weakens fourth amendment
> protection.

*United States v. Scott*, 270 F.3d 30, 42 (1st Cir. 2001) (quoting *United States v. Silvestri*, 787

F.2d 736, 744 (1st Cir. 1986)) (internal quotations omitted).

First, the government argues that the discovery of the contents within the fanny pack

were inevitable because PRPD officers had reasonable suspicion to hold the fanny pack for

investigative purposes, given they had observed Defendant toss it after they had identified

themselves as police and began executing Defendant's arrest. ECF No. 29 at 8. To find a bag and

search a bag are two different things. Even if the PRPD had reasonable suspicion to hold the bag,

that fails to explain how PRPD officers would have inevitably had lawful authority to search the black fanny pack. Nothing prevented PRPD officers from seeking a search warrant to search the fanny pack that they found in the Residence's backyard.

Additionally, the Government contends that the black fanny pack would have been inevitably discovered under the inventory search exception. ECF No. 36 at 8. Under the inventory-search exception, "police, as part of the routine procedure incident to incarcerating an arrested person, [can] search any container or article *in his possession*, in accordance with established inventory procedures." *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) (emphasis added). A valid inventory search is one in which police officers do not act in bad faith or for the sole purpose of investigation. *Colorado v. Bertine*, 479 U.S. 367, 371–72 (1987). Here, the Government argues that inventory search exception should apply because the fanny pack was property found in possession of Defendant at the time of his arrest. However, this argument is unsupported: both Sgt. Gómez Águila and Agent Gómez testified that the black fanny pack was not in Defendant's actual possession when he was arrested, nor in his immediate vicinity or control. Tr. (8/15/23) 83, ¶¶ 16–23; Tr. (8/29/23) 32, ¶¶ 20–22.

This is not a case dealing with abandonment of property because the black fanny pack was an item thrown in the Residence's backyard, not in a public area. Nor is this a situation where PRPD officers were immediately aware of the incriminating contents within the fanny pack because those contents were in plain view before touching it. Finally, this is not a situation where PRPD officers followed standardized procedures like in the case of an inventory search of a seized vehicle after an arrest. *Cf. United States v. Rivera*, 465 F. Supp. 2d 89, 110 (D.P.R. 2006) ("[T]here is a standard policy at the PRPD of routinely securing and inventorying contents of the impounded vehicle."). While the Government has produced a portion of the PRPD's

18

policy regarding evidence (ECF No. 33-1), that policy does not explain that the PRPD would have been authorized to take the black fanny pack in this case. The portion of the policy submitted by the Government explains what steps to take with evidence it has gathered, not which items they are authorized to seize while executing an arrest warrant. Moreover, the video recording introduced into evidence on December 21, 2023, has cast a cloud over Agent Gómez's trustworthiness on his version of the initial phases of the intervention, at least with regards to his claim that once he saw Defendant throw the black fanny pack to the backyard he left it under the uninterrupted custody of Agent Gotay. Therefore, it is quite possible that Agent Gómez never actually saw Defendant throwing the black fanny pack to the backyard. Otherwise, one would have to believe that Agent Gómez saw Defendant toss the fanny pack to the backyard and left it unattended to. Therefore, the inventory exception and inevitable discovery doctrine do not apply, and the items found inside the fanny pack ought to be excluded from the evidence admissible at trial.

### 3. Whether the rifle and ammunition found inside the bedroom closet should be suppressed.

The Government argues that the rifle and ammunition found in the bedroom closet were lawfully seized based on the protective sweep and plain view doctrines. ECF No. 74 at 3. Another exception justifying the warrantless search of a home is the protective sweep doctrine. *United States v. Delgado-Pérez*, 867 F.3d 244, 251 (1st Cir. 2017). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). There are two types of protective sweeps. *Id.* at 334. The first—which does not require probable cause or reasonable suspicion—allows police officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.*

19

The second kind of protective sweep extends to areas beyond the immediately adjoining spaces and requires officers conducting the sweep to have a reasonable suspicion of danger at the moment of the search. *United States v. Hernandez-Mieses*, 931 F.3d 134, 141–42 (1st Cir. 2019); *Delgado-Pérez*, 867 F.3d at 252. In other words, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S at 334. "The reasonable suspicion standard is 'considerably less demanding than the level of proof required to support a finding of probable cause,' . . . but must be based on more than an unfounded speculation." *United States v. Winston*, 444 F.3d 115, 118 (1st Cir. 2006) (citations omitted). Additionally, a protective sweep's scope "must be limited to its purpose." *Buie*, 494 U.S at 335. In other words, a protective sweep applies only to spaces where a person could be hiding and does not grant a full search of the home, and it cannot be "longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36.

Here, the parties dispute whether the PRPD had the required "articulable facts" to authorize the second type of protective sweep under *Buie*. ECF No. 74 at 3–5; ECF No. 75 at 8–12. Before arresting Defendant on February 14, based on prior briefing, Agent Gómez and Sgt. Gómez Águila knew that Defendant had an outstanding arrest warrant for selling cocaine to an undercover officer and at least one prior conviction related to firearms. Tr. (8/15/23) 47, ¶¶ 23–25; Tr. (8/15/23) 48, ¶¶ 1–3; Tr. (8/21/23) 7, ¶¶ 12–19. Furthermore, Agent Gómez testified that "he was told that [Defendant] was a heavy target and that [the PRPD] had to be cautious while serving his arrest warrant." Tr. (8/21/23) 7, ¶¶ 17–19. Upon reaching the Residence at approximately 3:00 a.m. to execute an arrest warrant, Sgt. Gómez Águila and the Special Arrest

Unit eventually breached the Residence. Tr. (8/15/23) 52, ¶¶ 14–23; Tr. (8/15/23) 53, ¶¶ 14–17; Tr. (8/15/23) 54, ¶¶ 14–17.

After clearing the first floor, Sgt. Gómez Águila and his team proceeded up the stairway to the second floor. Tr. (8/15/23) 55, ¶¶ 5–18. As Sgt. Gómez Águila reached the top of the stairway into the second floor's rear-side hallway, he observed Defendant running from the Residence's backdoor and away from arresting officers, toward the bedroom-side hallway leading to the Residence's bedrooms.[9] Tr. (8/15/23) 58, ¶¶ 11–25; Tr. (8/15/23) 88, ¶¶ 12–17. As Defendant reached the bedroom-side hallway, Sgt. Gómez Águila lost sight of Defendant for approximately ten seconds and began issuing commands to which Defendant complied, leading to his arrest in the part of the hallway that gives access to the backdoor and stairs. Tr. (8/15/23) 59, ¶¶ 1–22; Tr. (8/15/23) 82, ¶¶ 8–15; Tr. (8/15/23) 83, ¶¶ 7–10; Tr. (8/15/23) 88, ¶¶ 12–17.

After arresting Defendant, Sgt. Gómez Águila asked whether others were in the Residence, and Defendant replied that his mother was with him. Tr. (8/15/23) 59, ¶¶ 11–17. From the rear hallway, Sgt. Gómez Águila began issuing commands toward the bedroom-side hallway to Defendant's mother. Tr. (8/15/23) 59, ¶¶ 16–17; Tr. (8/15/23) 60, ¶¶ 3–12. Sgt. Gómez Águila further testified that it took approximately one minute and thirty seconds for Defendant's mother to reach his team because she was an elderly, handicapped person using a walker. Tr. (8/15/23) 84, ¶¶ 17–25; Tr. (8/15/23) 85, ¶¶ 1–3. After Defendant's mother was in police custody, Sgt. Gómez Águila and his team started conducting a security sweep of the second floor. Tr. (8/15/23) 61, ¶¶ 2–7; Tr. (8/15/23) 85, ¶¶ 4–8

Based on the facts above, the Government argues that the PRPD's protective sweep following Defendant's arrest was lawful because it was based on several reasonable articulable

---

[9] Both sides of the hall connect to make an "L" shape. ECF No. 76-1 at 1.

facts. ECF No. 74 at 4–5. First, the Government contends that the protective sweep was proper

because Sgt. Gómez Águila knew that Defendant had an outstanding arrest warrant for selling

cocaine to an undercover officer. ECF No. 74 at 4. However, this prior knowledge, alone, is not

enough to satisfy the reasonable suspicion standard under *Buie*.

      The mere fact the defendant is being arrested on drug trafficking charges does not give

automatically officers a reasonable basis to justify a protective sweep. *Delgado-Pérez*, 867 F.3d

at 254 ("We have never held that because the person arrested is sought for drug trafficking, it is

reasonable to suspect for that reason alone that there may be another person in the home who

poses a danger to officer safety."). While the PRPD did indeed execute an arrest warrant against

Defendant, the Government fails to point to any evidence in the record that Defendant's alleged

drug offense is linked to other confederates. Moreover, even if Defendant had confederates in his

alleged drug offense, it is unlikely they would be at the Residence with his elderly mother

present around 3:00 a.m. *See id.* (finding that it was unlikely that drug confederates would be in

defendant's home between 4:30 and 5:00 a.m.).

      Similarly, the Government argues that the protective sweep was proper because

Sgt. Gómez Águila knew that Defendant had at least one prior felony conviction related to

firearms. ECF No. 74 at 4. Effectively, the Government contends that the PRPD officers had

reason to believe that Defendant could be armed and dangerous. In *Delgado-Peréz*, the First

Circuit left open the question of whether an arrestee's own dangerousness could be a factor in the

protective sweep analysis.[10] *Delgado-Pérez*, 867 F.3d at 253 n.5. Regardless, other First Circuit

case law makes clear that officers must have a particular reason to think that a suspect is armed

---

[10] Yet, the First Circuit has expressed an opinion on this issue in dictum of an earlier case. *United States v. Nascimento*, 491 F.3d 25, 49 (1st Cir. 2007) ("Protective sweeps . . . are not justified by the potential threat posed by the arrestee but, rather, by the potential threat posed by unseen third parties who may be lurking on the premises." (dictum) (citing *Buie*, 494 U.S. 325, 336)).

and dangerous. *Winston,* 444 F.3d 115, 119 (upholding protective sweep where officers knew that defendant "was a potentially dangerous drug dealer *who had recently purchased a bullet-proof vest and firearms* and had numerous, potentially armed and dangerous cohorts (emphasis added)); *United States v. Daoust*, 916 F.2d 757, 759 (upholding protective sweep where the officers "knew that [defendant] had a prior criminal history of violent behavior, *[and] they knew he owned a handgun*, which he kept in a rather unusual place in the kitchen" (emphasis added)).

Furthermore, it is important to reiterate that the articulable facts used to justify the protective sweep are the ones used at the moment of the protective sweep. *Delgado-Pérez*, 867 F.3d at 252. At the moment of the protective sweep on the second floor, Defendant was already under arrest, lying on the floor and restrained. Tr. (8/15/23) 59, ¶¶ 18–22. Therefore, Sgt. Gómez Águila's pre-arrest awareness that Defendant had a prior weapons conviction cannot itself directly justify the post-arrest sweep because once Defendant was arrested without resisting, he no longer posed a threat to the police. *See United States v. Serrano-Acevedo*, 892 F.3d 454, 459 (1st Cir. 2018) (noting that because arrestee had been detained, government's justification for protective sweep depended on "articulable facts" supporting a reasonable inference that, at the time of the sweep, there was an *additional* suspect in the house who was armed); *United States v. Paradis*, 351 F.3d 21, 29 (1st Cir. 2003) (holding protective sweep unlawful where "officers had no reason to believe that there might be an individual posing a danger to the officers or others; [instead], they had searched the apartment and had only found [defendant], who was already in custody at the time of the search at issue"); *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996) ("The facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual."); *United States v. Lundin*,

817 F.3d 1151, 1161 (9th Cir. 2016) (holding that protective sweep exception did not apply when "the only plausible threat to the safety of those on the scene" was the arrested suspect who "had already been handcuffed and placed in a police vehicle"); *United States v. Henry*, 48 F.3d 1282 (D.C. Cir. 1995) ("We note at the outset that the officers' awareness that Henry had a previous weapons conviction and could be dangerous did not itself directly justify the sweep. Once Henry was in custody, he no longer posed a threat to the police.")

Additionally, the Government claims that the protective sweep was justified since the Residence was in a high-crime area, as described by Sgt. Gómez Águila's testimony:

> Due to the location of the residence due to the information provided to us, it was a dangerous area, and due to the reason of the arrest warrant because the person was wanted for controlled substances and weapons, and sadly Puerto Rico practically in all places is considered a high crime rate area.

ECF No. 74 at 4; Tr. (8/15/23) 45, ¶¶ 17–22. This testimony is also unpersuasive to justify the protective sweep. While Sgt. Gómez Águila testified that he was provided information that the Residence was in high crime area, the record is devoid of what exactly made this area dangerous or whether it was reliable.

In addition, Sgt. Gómez Águila stated that he believed all of Puerto Rico to be a high crime area. Tr. 76, ¶¶ 10–16. To credit Sgt. Gómez Águila's generalization as an articulable fact supporting reasonable suspicion to justify a protective sweep would effectively allow police to conduct protective sweeps in every house in Puerto Rico regardless of whether the target has already been arrested and there is no reason to believe that others are in the residence. This is clearly not what the Supreme Court contemplated in *Buie*. Even if Sgt. Gómez Águila's testimony held weight, "mere presence in a high-crime area, without more, is insufficient to meet the reasonable suspicion benchmark" required to support a protective sweep. *United States v.*

*Martins*, 413 F.3d 139, 150 (1st Cir. 2005), *abrogated on other grounds by Hill v. Walsh*, 884

F.3d 16, 19 (1st Cir. 2018).

Next, the Government points to the fact that Defendant did not answer the door after the

PRPD knocked and announced their presence, arguing that the PRPD was dealing with a

potentially uncooperative person at this point. ECF No. 74 at 4. As a preliminary matter, the fact

that a suspect does not answer his door to police executing an arrest warrant is not conclusive

that other dangerous individuals are inside the home. Several alternate reasons exist as to why a

suspect does not open his door to officers executing an arrest warrant: he may be fleeing the

scene, he may be resisting arrest, he may be asleep, or he may be hiding or destroying evidence.

Indeed, it appears that Defendant was attempting to hide evidence by throwing the black fanny

pack outside the back door. As explained above, any safety concerns that Sgt. Gómez Águila

could have had about Defendant's lack of cooperation that would lead him to reasonably believe

a protective sweep was justified should have been dispelled after Defendant complied with his

commands, submitted to his arrest, and told him that his mother was the only other occupant

present. *See Delgado-Pérez*, 867 F.3d at 252.

The final fact that the Government points to is that, as Sgt. Gómez Águila and his team

reached the second floor, Defendant ran away from them into the Residence's bedroom hallway,

outside the range of visibility. While this fact could reasonably put an arresting officer on high

alert, it still falls short. Instead of explaining why this fact could lead a reasonable officer to

believe that another dangerous individual might be present on the arrest scene, the Government

contends that "Defendant r[a]n into an area of the home that was not visible, where other

people—potentially armed—*could* be hiding." ECF No. 74 at 5 (emphasis added). "While 'there

could always be a dangerous person concealed within a structure[,] . . . that in itself cannot

justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*.'" *Delgado-Pérez*, 867 F.3d at 256 (quoting *United States v. Carter*, 360 F.3d 1235, 1242–43 (10th Cir. 2004)).

While "the experienced perceptions of law enforcement agents deserve deference," nothing in Sgt. Gómez Águila's testimony articulates why it was reasonable, in this case, to infer from Defendant's flight into the bedroom hallway that another dangerous individual was likely to be lying in wait beyond that hallway. Sgt. Gómez Águila did not testify that anything regarding this specific event contributed to his decision to conduct a protective sweep. To the contrary, his testimony revealed that while Defendant was out of his sight, he did not hear anything indicating someone else was in the Residence, such as a door slam or the voices of others. Tr. (8/15/23) 83, ¶¶ 8–15. Yet, the only thing that Sgt. Gómez Águila did testify compelled him to sweep the remainder of the second floor was his prior training, which directed him to perform a protective sweep of the entire area while conducting a tactical entry in support of executing an arrest warrant. Tr. (8/15/23) 48, ¶¶ 7–25; Tr. (8/15/23) 49, ¶¶ 1–8; Tr. (8/15/23) 86, ¶¶ 1–23. While this training is fundamentally rooted in preserving officer safety, Sgt. Gómez Águila's "testimony hardly suffices to show that the sweep was based on specific articulable facts about safety concerns that existed at the time of the sweep." *Delgado-Pérez*, 867 F.3d at 256 n.7 (holding that a Puerto Rico officer's standard practice to conduct protective sweeps when making arrests in and of itself does not justify a protective sweep).

Even when considered as a whole, the Government's facts explained above do not rise to the level of articulable facts supporting the presence of another dangerous individual in the Residence. "To be sure, the [PRPD] did not know for certain that no one else would be in [the] [R]esidence who might pose a danger. But '[l]ack of information cannot provide an articulable

basis upon which to justify a protective sweep.'" *Delgado-Pérez*, 867 F.3d at 256 (citing *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996)). Whether the PRPD's sweep was lawful under the first type of protective sweep authorized under *Buie* will now be addressed.

As mentioned, the first type of *Buie* protective sweep does not require probable cause or reasonable suspicion and allows police officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 327. Defendant argues that this type of sweep was not justified because the bedroom closet, where the evidence was found, was not adjacent to the place of the arrest. ECF No. 75 at 9.

There is no "bright-line" rule for determining which spaces are "immediately adjoining the place of arrest" and thereby searchable under *Buie*; instead, the determination is made on a case-by-case basis. *See United States v. Archibald*, 589 F.3d 289, 298 (6th Cir. 2009) (where defendant arrested on porch, the "immediately adjoining" area was the living room situated inside the door, but not the more distant kitchen and upstairs bedroom); *United States v. Charles*, 469 F.3d 402, 405–06 (5th Cir. 2006) (where defendant "arrested just at the entrance to the open storage unit," officer's "cursory sweep of the unit immediately adjacent to the site of the arrest was permissible"); *United States v. Thomas*, 429 F.3d 282, 287 (D.C. Cir. 2005) (where defendant arrested "in the hallway immediately inside his front door," search of entire apartment justified because every room swept "could be immediately accessed from the hallway"). In determining whether an area is immediately adjoining the place of arrest for purposes of a protective sweep, courts consider "the particular configuration of the dwelling." *United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008) (stressing "officers were in a confined space; the basement was not well lit; the area contained a partial wall dividing the space into at least two

areas"); *United States v. Richards*, 937 F.2d 1287, 1291 (7th Cir. 1991) (noting that an "ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings")). Ultimately, the "safety of the officers, not the percentage of the home searched, is the relevant criterion." *Thomas*, 429 F.3d at 287.

Courts have held the first type of protective sweep under *Buie* lawful when police search a bedroom that opened into a hallway after police arrested a defendant in that hallway. *See Thomas*, 429 F.3d at 287 ("Because the entrance to the bedroom was a straight shot down the hallway from the spot where Thomas was arrested, the bedroom was a place immediately adjoining the place of arrest from which an attack could be immediately launched."); *United States v. Ford*, 56 F.3d 265, 267, 270 (D.C. Cir. 1995) (holding that officers' search of the defendant's bedroom was permissible because the bedroom, from which the defendant emerged prior to his arrest, was located down a "short hallway" where the defendant was arrested); *United States v. Davis*, 906 F. Supp. 2d 545, 552 (S.D.W.V. 2012) (concluding that the officers' "cursory check of the rooms immediately adjoining where Defendant was arrested" was authorized as an initial protective sweep where the defendant was arrested in an interior hallway adjoining the living room, bathroom, and two bedrooms); *United States v. Robinson*, 775 F. Supp. 231, 232 (N.D. Ill. 1993) (holding a protective sweep of a bedroom valid because the defendant's arrest was made at the mouth of an interior hallway leading to the bedroom).

Here, the Residence's second floor has an "L" shape hallway, made up of the rear-side hallway and the bedroom-side hallway. ECF No. 76-1. Defendant was arrested in the rear side, which is the part of the hallway at the top of the Residence's stairs. Tr. (8/15/23) 82, ¶¶ 8–15; Tr. (8/15/23) 83, ¶¶ 7–10. In the rear side, there is a door leading to the Residence's back yard and at the end of the rear side, a restroom on the second floor. Tr. (8/15/23) 88, ¶¶ 12–17; ECF Nos. 72-

28

1–2. Connected at the end of the rear side is the bedroom-side hallway. Tr. (8/15/23) 88, ¶¶ 12–17; ECF No. 76-1 at 1. The bedroom side contains the four rooms of the Residence. ECF No. 76-1 at 1. The evidence seized as a result of the protective sweep was found in the first bedroom on the left of the bedroom-side hallway. Tr. (8/15/23) 89, ¶¶ 7–11. The record is not clear on where exactly in the rear-side hallway Defendant was arrested, nor is it clear how far the closet was from where Defendant was arrested. However, the L-shaped hallway was a relatively small and confined space. ECF Nos. 72-4–11. Specifically, the rear-side hallway, where Defendant was arrested, was not wide nor long, and the bedroom with the closet where the evidence was found was small. ECF Nos. 72-1–2; 72-16–17.

Therefore, given the tight quarters of the Residence's second floor, I find that the bedroom with the closet where evidence was seized was immediately adjoining the rear side of the hallway where Defendant was arrested. Additionally, given the small size of that room, an accomplice hiding in the closet could launch an attack on the rear-side hallway in a matter of seconds. While case law addresses situations where the hallway is a "straight shot" and therefore arresting officers have visibility of the immediately adjoining bedrooms, that does not change the fact that an attack could be immediately launched simply because a hallway has a bend in it. Indeed, an attacker may have a better vantage point to ambush officers in an L-shaped hallway than a straight hallway due to the cover provided by the bend of the hallway.

Having made the arrest in the rear side of the hallway, the PRPD officers were entitled, under *Buie*, to conduct a protective sweep to ensure their safety and that of the arrestee. The arrest would not be considered complete if the arresting officers were gunned down by persons concealed in closets or other spaces immediately adjoining the place of arrest. While the PRPD officers did not have to go through the bed-side hallway to leave the Residence after Defendant

and his mother were arrested, "[l]aw enforcement officers . . . are not required when making an arrest inside a building to surreptitiously back out of that building, guns drawn and pointed in all directions." *United States v. Robinson*, 775 F. Supp. 231, 234–35 (N.D. Ill. 1991). Accordingly, despite the absence of any articulable facts to suggest that there was a dangerous third party concealed in the Residence's second floor bedroom closet, this area was immediately adjoining the place of arrest and where the agents had lawful authority under *Buie* to conduct a protective sweep. Whether the PRPD lawfully seized the items under the plain view doctrine will now be addressed.

"[T]he plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015) (citing *United States v. Sanchez*, 612 F.3d 1, 4–5 (1st Cir.2010); *United States v. Jones*, 187 F.3d 210, 219–221 (1st Cir. 1999)). "In the 'plain view' context, this means that probable cause exists when the incriminating character of an object is immediately apparent to the police." *Sanchez*, 612 F.3d at 5

Here, while conducting the sweep, Sgt. Gómez Águila found what appeared to be a rifle in plain sight within the bedroom closet. Tr. (8/15/23) 62, ¶¶ 4–24. As explained above, he had lawful right to access the closet because he was conducting a protective sweep. Although the item was later determined to be fake, Sgt. Gómez Águila had probable cause to seize the item because it was indistinguishable from a real rifle at the time Sgt. Gómez Águila saw it. Tr. (8/15/23) 102, ¶¶ 19–22. Finally, while testifying about Exhibit 5 (ECF No. 71-8), a photo of the weapon found, Sgt. Gómez Águila confirmed that the photo represented how he found the closet while conducting the protective sweep. Tr. (8/15/23) 65. This testimony is credible and thus, it is

hereby concluded that the first rifle found, which was later determined to be fake, was covered by the plain view doctrine.

After the sweep concluded and the Residence was cleared, Sgt. Gómez Águila notified Agent Gómez on what he found, and Agent Gómez proceeded to the closet. As Agent Gómez began to observe and examine the rifle discovered by Sgt. Gómez Águila, Agent Gómez noticed the handle of another firearm protruding from a blue backpack. Tr. (8/21/23) 25, ¶¶ 18–25; Tr. (8/21/23) 26, ¶¶ 1–3. Agent Gómez proceeded to first check the rifle discovered by Sgt. Gómez Águila and determined it was not real. Tr. (8/21/23) 28, ¶¶ 6–19. Next, Agent Gómez checked the other firearm that was protruding from the blue bag and verified that it was a real rifle. Tr. (8/21/23) 28, ¶¶ 23–25; Tr. (8/21/23) 29, ¶¶ 1–3. While Agent Gómez removed the rifle from the blue bag, he observed various types of ammunition within the bag. Tr. (8/21/23) 30, ¶¶ 2–5; Tr. (8/21/23) 31, ¶¶ 2–3.

As a preliminary matter, Agent Gómez had a lawful right to be at the closet after Sgt. Gómez Águila told him about the rifle in the upstairs bedroom closet, and the incriminating character of a rifle and ammunition are immediately apparent in the context of a previously convicted felon. Therefore, the only issue remaining is whether the rifle and ammunition seized in the bedroom closet were in plain view. Defendant argues that the real rifle seized could not have been in plain view because Sgt. Gómez Águila did not see it while conducting the protective sweep. ECF No. 75 at 12–13. However, Sgt. Gómez Águila explained that he did not see the real firearm in the bag because during his protective sweep, his focus was searching for people. Tr. (8/15/23) 90, ¶¶ 16–25. It is reasonable that Sgt. Gómez Águila did not see the real rifle protruding from the bag because in the rush of the moment, his vision could have been

fixated on what he saw at a quick glance, that is the fake firearm which was fully exposed and more readily apparent. ECF Nos. 71-8–10.

Defendant also argues that the real rifle was not in plain view because Sgt. Gómez Águila testified that an unnamed officer was put to guard the weapon after it was immediately found, and if it was in plain view, that unnamed officer should have seen it. ECF No. 75 at 13. This argument discounts the job of an officer on a special arrest team who is put to guard a weapon. That officer's job was not to discover evidence; it was to guard the weapon to ensure no threat had access to it. Therefore, it is reasonable that an officer put to guard the closet would be doing his job, not looking inside of the closet with his back turned to potential unknown threats. Finally, as previously discussed, Defendant claims that, based on Agent Gómez's credibility being put into question because of the video recording evidence, none of Agent Gómez's testimony should be credited. While it is true that Agent Gómez was the only person to have seen the real rifle in plain view, Sgt. Gómez Águila confirmed that the photograph taken by service technicians before Agent Gómez touched anything in the closet (ECF Nos. 71-8–10) accurately represented how he found the closet while conducting the protective sweep. Tr. (8/15/23) 65; Tr. (8/21/23) 26. Part of the real firearm can be seen in this picture. ECF Nos. 71-8–10. Therefore, Sgt. Gómez Águila's statement corroborates Agent Gómez's testimony, making it credible that he saw the rifle in plain view.

Defendant also contends that the ammunition found in the blue bag inside the closet was not in plain view because Agent Gómez did not explicitly testify that the ammunition was in plain view. ECF No. 75 at 13. However, Agent Gómez did testify that when he took the "firearm out of the bag, [he] observed that inside there were rounds, there were many rounds." Tr. (8/21/23) 30, ¶¶ 2–5. Additionally, Agent Gómez clarified that he found "loaders for different

32

types of weapons and the rounds for different calibers." Tr. (8/21/23) 31, ¶¶ 3–4. Finally,

Defendant asserts that the ammunition could not have been in plain view because Agent Gómez

testified that he searched the bag for "clarity of the case" and "to know what else was in the

bag." ECF No. 75 at 13. However, those responses made by Agent Gómez were explicitly made

in response to why he conducted an inventory of what was in the bag, not why he searched the

bag:

> Q [Government] I'm removing Government Exhibit 6 and I'm going to show you
> what's been admitted as Government Exhibit 7 [ECF No. 71-13]. Do you recognize
> what appears in this photograph?
>
> A [Agent Gómez] Yes.
>
> Q What is it?
>
> A That is a brief inventory that I prepared as to all the seized property at that
> moment.
>
> Q Why did you perform a brief inventory?
>
> A For the clarity of the case and to know what else was in the bag.
>
> Q After doing this brief inventory, what happened with these items?
>
> A I picked everything up and put it back again in the bag in order to take it as
> evidence on the place.

Tr. (8/21/23) 31, ¶¶ 20–25; Tr. (8/21/23) 32, ¶¶ 1–4. Even if Agent Gómez wanted "to know

what else was in the bag," that fails to discredit the fact that he saw ammunition while he took

the real rifle out of the bag. While it is acknowledged that Agent Gómez's credibility is in

question and that he was the only individual to see the ammunition in plain view, other facts

support his testimony. First, there was a large amount of ammunition found in relation to the size

of the bag, consistent with the fact that the seized ammunition was in plain view while removing

the rifle. ECF No. 71-13. Second, it is more probable than not that someone would keep their

ammunition collocated with their weapons. Thus, Agent Gómez's testimony regarding him seeing ammunition while pulling out the real rifle is credible.

Finally, Defendant asserts that the only magazine drum seized from the Residence was actually located in an orange and black fanny pack, not the blue bag where Agent Gómez found the remaining ammunition. ECF No. 75 at 13. Defendant bases this assertion on Agent Gómez's testimony regarding Exhibit D7 (ECF No. 72-20):

> Q [Defense Counsel] I'm showing you what has been entered into evidence as Defense Exhibit D-7. Do you recognize this item or items, I should say?
>
> A [Agent Gómez] Honestly, I don't recognize that well, the black and orange bag.
>
> Q Now as the investigating officer in this case, it was your responsibility to direct [the Service Technicians] in the photographing of the evidence.
>
> A Yes, correct.
>
> Q At some point you indicated to the officer to take a picture of this magazine drum and this orange Quick Silver bag.
>
> A Yes, correct, if that property is there, that was the fact and I have no doubt about it.
>
> Q *So it's possible, perhaps probable* that the firearm magazine, the drum magazine was recovered from inside of this orange Quick Silver bag.
>
> A Correct.

Tr. (8/29/23) 45, ¶¶ 18–25; Tr. (8/29/23) 46, ¶¶ 1–10 (emphasis added). While Agent Gómez's testimony above could make one believe that the drum magazine was inside an orange and black fanny pack, that testimony is speculative because at best he is stating only what is merely possible. Moreover, this testimony does not rebut Agent Gómez's testimony that he found "loaders for different types of weapons and the rounds for different calibers" inside the blue bag. Tr. (8/21/23) 31, ¶¶ 3–4. To be clear, property receipts from both the PRPD and HSI indicate that only two magazines (or as Agent Gómez referred to them, "loaders") were found inside the blue

bag[11]: one ".40 [b]lack and clear drum clip" and one "[b]lack metal [r]ifle [m]agazine." ECF No. 71-19; ECF No. 71-21 at 1–2. Therefore, when Agent Gómez stated that he found "loaders" he was indicating that he found the black rifle magazine and the drum clip. Had he only found one magazine in the blue bag, his use of the plural form would not make sense. Finally, Defendant fails to show or indicate where the orange and black fanny pack bag was located, negate the possibility that the fanny pack was found inside the blue bag, or indicate whether this fanny pack was zipped or unzipped to be within Agent Gómez's plain view. Therefore, the ammunition— which includes the drum clip—and rifle in the bedroom closet were found in plain view as a result of a lawful protective sweep, and it is recommended that the rifle and ammunition found in the bedroom closet not be suppressed.

## B. Fifth Amendment Claim

Finally, Defendant argues that his statements made to HSI TFOs should be suppressed because he invoked his Fifth Amendment right to counsel and right to remain silent. ECF No. 75 at 14. Both theories fail, and therefore, it is recommended that Defendant's statements made to the HSI TFOs not be suppressed.

### 1. Whether Defendant invoked his Fifth Amendment right to counsel.

"In *Miranda v. Arizona*, the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481– 82 (1981) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). "[A]fter initially being advised

---

[11] These exhibits also show that two black magazines containing 9mm ammunition were found while executing the arrest warrant; however, those items were found it the black fanny pack that was thrown outside the Residence. ECF No. 71-19; ECF No. 71-18; Tr. (8/21/23) 37, ¶¶ 1–8.

of his *Miranda* rights, [an] accused may himself validly waive his rights and respond to interrogation." *Id*. at 484 (citation omitted).

A suspect's "request for counsel must be clear and unambiguous." *United States v. Oquendo-Rivas*, 750 F.3d 12, 18 (1st Cir. 2014) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). "Where a request, marred by ambiguity or equivocation, suggests only 'that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.'" *Id.* at 19 (quoting *Davis*, 512 U.S. at 459). Courts assess whether a suspect's request "be such that 'a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Id.* (quoting *Davis*, 512 U.S. at 459); *see also Davis*, 512 U.S. at 459 (noting that "a suspect need not speak with the discrimination of an Oxford don" to adequately "articulate his desire to have counsel present" (citations and internal quotations omitted)).

Additionally, when determining whether a suspect has invoked his right to counsel, a court may look at the context in which the invocation was made. *See Smith v. Illinois*, 469 U.S. 91, 98 (1984) ("Where nothing about the request for counsel *or the circumstances leading up to the request* would render it ambiguous, all questioning must cease." (emphasis added)). However, "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 100. "Immediately after a suspect has invoked the right to counsel, all questioning must cease until such counsel is provided." *Oquendo-Rivas*, 750 F.3d at 18 (citing *Edwards*, 451 U.S. at 485).

Here, on February 14, 2023, the HSI TFOs met with Agent Gómez before interviewing Defendant, and Agent Gómez told them that Defendant previously refused to speak to PRPD

officers.[12] Tr. (8/15/23) 133, ¶¶ 12–25; Tr. (8/15/23) 134, ¶¶ 1–6. As the interview began, the

HSI TFOs provided Defendant the HSI *Miranda* Form. Tr. (8/15/23) 114, ¶¶ 6–13. During that

time, Agent Gómez entered the interview room and asked Defendant to sign the PRPD *Miranda*

Form to document the verbal *Miranda* warnings that Agent Gómez had given to Defendant at the

Residence. Tr. (8/15/23) 118, ¶¶ 10–24. Tr. (8/21/23) 43, ¶¶ 17–24. Defendant signed the PRPD

*Miranda* Form explicitly noting that he did not waive his rights and signed the HSI *Miranda*

Form indicating that he affirmatively waived his rights. ECF 71-20 at 2; ECF No. 71-23 at 2.

Specifically, regarding the PRPD *Miranda* Form, Defendant marked a box with the following

statement: "I understand the rights that those warnings bestow upon me, and I decided **TO NOT**

**waive** the same" (the "**TO NOT waive** line"). Tr. (8/21/23) 44, ¶¶ 17–23; ECF No. 71-20 at 2.

Both forms were dated February 14, 2023, at 1:50 p.m. ECF No. 71-20 at 2; ECF No. 71-23 at 2.

At no time during the signing of either *Miranda* form did Defendant explicitly ask for an

attorney. Tr. (8/15/23) 121, ¶¶ 18–20; Tr. (8/21/23) 44, ¶¶ 22–25. Agent Gómez stated that his

reason for administering the PRPD *Miranda* Form when he did was because he realized, after

giving that same form to Defendant's mother, that he had forgotten to give the form to Defendant

at the Residence. Tr. (8/21/23) 43, ¶¶ 16–25; Tr. (8/21/23) 44, ¶¶ 1–16. In other words, he

administered the PRPD *Miranda* Form to Defendant to document the same *Miranda* warnings he

had given to Defendant earlier at the Residence. Tr. (8/21/23) 43, ¶¶ 16–25; Tr. (8/21/23) 44, ¶¶

1–16. After Defendant signed the PRPD *Miranda* Form, Agent Gómez left the interrogation

---

[12] TFO Vázquez was not consistent as to whether he was advised by Agent Gómez on the subject of whether Defendant refused to talk to PRPD officers. Hr'g, Aug. 21, 2023, at 10:40 a.m. Regardless, once a suspect invokes his *Miranda* rights, "knowledge of that request is imparted to all law enforcement officers who subsequently deal with the suspect." *See United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985) (quoting *United States v. Scalf*, 708 F.2d 1540, 1544 (10th Cir. 1983)); *United States v. Downing*, 665 F.2d 404, 407 (1st Cir. 1981) ("Law enforcement officers working in teams should be discouraged from violating the accused's constitutional rights by failing to ascertain or advise one another whether those rights had been previously asserted.").

room. Tr. (8/15/23) 119, ¶¶ 10–12; Tr. (8/21/23) 45, ¶¶ 8–9. Thereafter, Defendant proceeded to talk to the HSI TFOs and made the statements at issue. Tr. (8/15/23) 119, ¶¶ 2–18; Tr. (8/21/23) 45, ¶¶ 1–9.

Before addressing the arguments, various matters need to be clarified. First, the PRPD *Miranda* Form administered by Agent Gómez was provided to Defendant to *partially* document the earlier *Miranda* warnings given to Defendant while at the arrest scene, not to reinitiate questioning. Agent Gómez's testimony on his purpose behind administering the form when he did is credible because he exited the HSI TFOs' interrogation as soon as he received the signature,[13] which shows that he was not administering this form to reinitiate questioning with Defendant but instead document the prior *Miranda* warnings given at the Residence. Additionally, it is unlikely that Agent Gómez was administering the PRPD *Miranda* Form for another reason when his intentions in administering the form were explicitly expressed to Defendant and the HSI TFOs. Tr. (8/15/23) 119, ¶¶ 16–25; Tr. (8/15/23) 120, ¶¶ 1–3; Tr. (8/21/23) 43, ¶¶ 16–25; Tr. (8/21/23) 44, ¶¶ 1–2.

The word "partially" is being used because, while the uncontroverted evidence shows that Defendant was in fact read his *Miranda* rights by Agent Gómez before the administration of the PRPD *Miranda* Form,[14] nothing in the record indicates that Defendant affirmatively stated his refusal to waive his rights before February 14, 2023, at 1:50 p.m. Indeed, Agent Gómez's testimony reveals that Defendant simply remained silent after receiving the warnings at the Residence. Tr. (8/15/23) 29, ¶¶ 12–25; Tr. (8/21/23) 30, ¶¶ 1–2. Therefore, the PRPD *Miranda*

---

[13] Agent Gómez's testimony regarding his swift exit of the interrogation scene was corroborated by TFO Vázquez. Tr. (8/15/23) 119, ¶¶ 10–12.

[14] While Agent Gómez's testimony alone supports the fact that he verbally read Defendant his *Miranda* rights at the Residence, Defendant has never challenged this fact. Therefore, Defendant wants the court to believe Agent Gómez's testimony as to his *Miranda* rights, but not believe his testimony as to the physical items seized. This is contrary to Defendant's argument that because of the video recording (Exhibit F), none of Agent Gómez's testimony can be believed.

Form documented only the *Miranda* warnings earlier given at the Residence; Defendant's

expression of his refusal to waive his rights, however, happened on February 14, 2023, at 1:50

p.m.—the same date and time he waived his rights on the HSI *Miranda* Form.

      Both the PRPD *Miranda* and the HSI *Miranda* Forms were effectively signed at the same

time because Agent Gómez interrupted the HSI TFOs when they were administering the HSI

*Miranda* Form.[15] The strongest evidence to support this is the fact that both forms are dated

February 14, 2023, at 1:50 p.m. ECF No. 71-20 at 2; ECF No. 71-23 at 2. Additionally,

Agent Gómez explained that, when he interrupted the HSI TFOs' interrogation, Defendant and

the HSI TFOs were filling out the HSI *Miranda* Form. Tr. (8/21/23) 44, ¶¶ 17–21. Finally, on

cross examination, Agent Vázquez revealed that he did not remember which form was filled out

first, the result of both forms being signed almost simultaneously. Hr'g, Aug. 21, 2023, at 10:42-

44 a.m. Now, the issue of whether Defendant invoked his right to counsel will be addressed.

      The parties do not dispute whether Defendant explicitly requested an attorney after given

verbal *Miranda* warnings by Agent Gómez or after receiving the PRPD and HSI *Miranda* Forms.

Instead, the parties dispute whether Defendant invoked his right to counsel when he marked the

**TO NOT waive** line on the PRPD *Miranda* Form. ECF No. 75 at 14; ECF No. 74 at 10.

However, that issue need not be resolved to determine whether Defendant invoked his right to

counsel here because it is also necessary to analyze the context in which Defendant signed the

PRPD *Miranda* Form. *See Smith*, 469 U.S. at 98. As explained above, both forms were signed at

effectively the same time, and therefore they should be considered together. While Defendant

marking the **TO NOT waive** line on the PRPD *Miranda* Form was an affirmative declaration to

not waive his Fifth Amendment rights, Defendant's execution HSI *Miranda* Form directly

---

[15] Whether the HSI *Miranda* Form was completed before the PRPD *Miranda* Form is unclear on the record;
however, the HSI TFOs had begun administering their *Miranda* rights when Agent Gómez entered the scene.

contradicted this. Defendant signed the HSI *Miranda* Form, which immediately before his signature stated, "At this time, I am willing to answer questions without a lawyer present." ECF No. 71-23 at 2. Because both forms were executed contemporaneously, a reasonable law enforcement agent observing this would not unequivocally understand Defendant's actions to be a request for an attorney. *Cf. United States v. Brown*, 287 F.3d 965, 972–73 (10th Cir. 2002) (holding that defendant did not unequivocally invoke the right to counsel when he stated simultaneously that he wanted to answer questions without a lawyer present, wanted a lawyer, and wanted to talk to a lawyer).

Defendant cites to a recent First Circuit opinion in *United States v. Donald*, 84 F.4th 59 (1st Cir. 2023) to further his argument. ECF No. 92. *Donald*, however, primarily deals with the issue of implied waiver and is not rather instructive on the issue of invoking the right to counsel, especially given the facts of this case. *Donald*, 84 F.4th at 66. In *Donald*, U.S. Drug Enforcement Agency officers executed multiple search warrants on a property and detained Donald in connection with a drug-distribution operation. *Id.* at 62. Thereafter, an officer recited *Miranda* warnings to Donald and other suspects and gave them a *Miranda* form to sign. *Id.* The form included questions about whether the suspects understood their *Miranda* rights and whether they wanted to waive those rights and speak to investigators. *Id.* Donald signed the form and did not place a checkmark on the line next to the statement that read, "Yes, I wish to talk to you now and waive my Fifth Amendment Right pursuant to Miranda." *Id.* Both parties agreed that this was an invocation of Donald's *Miranda* rights, and the First Circuit implied that this included the right to counsel. *Id.* at 66–97.

While *Donald* may lend support to Defendant's argument that the manner in which Defendant executed the PRPD waiver form—taken alone—may be enough to invoke the right to

counsel, *Donald* is not applicable given the specific facts here because *Donald* concerned only one *Miranda* form where Donald noted that he did not want to waive his rights.[16] Here, however, Defendant signed two conflicting *Miranda* forms at effectively the same time. Accordingly, it is recommended that Defendant's statements made to the HSI TFOs not be suppressed based on the right to counsel.

### 2. Whether Defendant's right to remain silent was violated.

The parties dispute whether the HSI TFOs lawfully resumed questioning Defendant after he previously remained silent when his *Miranda* rights were read at the Residence. In contrast with the *Miranda* right to counsel, "an invocation of the right to remain silent does not automatically bar the resumption of questioning at a later time." *Oquendo-Rivas*, 750 F.3d at 17 (citing *United States v. Andrade*, 135 F.3d 104, 107 (1st Cir. 1998)). Courts apply a four-part test to determine "whether the resumption of questioning is permissible: (1) whether a reasonable period of time passed prior to the resumption, (2) whether the same officer resumed questioning, (3) whether the suspect received refreshed Miranda warnings, and (4) whether questioning concerned the same alleged crime." *Id.* at 17–18 (citing *Michigan v. Mosley*, 423 U.S. 96, 104–06 (1975)) (additional citations omitted). A court also "must account for the totality of the circumstances, with an eye to determining whether the suspect retained the ability to choose whether and when to speak." *Id.* at 18 (citation and internal quotations omitted).

First, in an attempt to initiate questioning, Defendant received verbal *Miranda* warnings from Agent Gómez during the execution of the arrest warrant sometime between 3:00 and 4:00 a.m. on February 14, 2023. Based on the HSI *Miranda* Forms being dated February 14, 2023, at

---

[16] Additionally, Defendant cites to two report and recommendations, which interpret the same PRPD form, that lend support to his argument: *United States v. Cintron-Ortiz*, No. CR 21-316, 2023 WL 3719630 (D.P.R. May 30, 2023) and *United States v. Soler-Muñiz*, CR 19-247, ECF No. 59 (D.P.R. Mar. 2020). Again, these cases did not concern conflicting *Miranda* forms, like the case here, and therefore are not instructive.

1:50 p.m., the HSI TFOs initiated questioning the Defendant approximately nine to ten hours later, that is not immediately after the Defendant remained silent upon the reading of his rights at the Residence. Second, as discussed above, it was the HSI TFOs—new law enforcement officers—not Agent Gómez, who reinitiated questioning with Defendant. Third, as evidenced by the HSI *Miranda* Form, the HSI TFOs provided new *Miranda* warnings, which Defendant signed documenting his decision to speak to investigators without an attorney. ECF No. 71-23 at 2. Fourth, even though the questioning did involve the same offense, no testimony was presented showing that Defendant was coerced into speaking with the HSI TFOs. Accordingly, the factors, when viewed holistically, weigh in favor of the Government, and it is recommended that Defendant's statements made to the HSI TFOs not be suppressed based on the right to remain silent.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (ECF No. 20) should be GRANTED IN PART and DENIED IN PART. The contents of a black fanny pack found in the Residence's backyard, that is one firearm, two ammunition magazines, and two photo identification cards should be suppressed. The following things should not be suppressed: (1) contents found inside one of the Residence's bedroom closets: (a) one rifle and (b) ammunition; (2) Defendant's statements made to the HSI TFOs; and (3) one cell phone found inside one of the Residence's bedrooms. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley*

*Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 27th day of December, 2023.

s/Marcos E. López
U.S. Magistrate Judge