**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA

Plaintiff,

v.

DIEGO FERNÁNDEZ SANTOS,

Defendant.

CRIMINAL NO.: 23-063 (FAB)

**REPORT & RECOMMENDATION**

## I.   PROCEDURAL BACKGROUND

On February 23, 2023, a grand jury returned an indictment against Diego Fernández Santos ("Defendant") charging him with prohibited possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). ECF No. 8 at 1. On May 22, 2023, Defendant filed a motion to suppress, and a suppression hearing was held over three days: August 15, 21, and 29, 2023. ECF Nos. 20, 57, 65, 70. During the first day of the suppression hearing on August 15, 2023, Defendant confirmed that he was seeking to suppress the following evidence: (1) the contents of a black fanny pack found in the backyard of the home in which lived in (the "Residence"): (a) one firearm, (b) two ammunition magazines, and (c) two photographic identification cards; (2) contents found inside one of the Residence's bedroom closets: (a) one rifle and (b) ammunition; and (3) post-arrest statements made to Homeland Security Investigation Task Force Officers ("HSI TFOs"). Tr. (8/15/23) 21, ¶¶ 2–21.

After concluding the suppression hearing on August 29, 2023, both parties submitted post-hearing briefs. *See* ECF Nos. 74–75. In his post-hearing brief filed on September 5, 2023, Defendant moved for the first time to suppress a cell phone seized inside of the Residence. *See*

ECF No. 75 at 2, 13. On September 27, 2023, Defendant moved to reopen the suppression hearing in light of newly discovered video evidence capturing a portion of the exterior of the Residence at the initial stage of the execution of the arrest warrant on February 14, 2023.[1] ECF No. 80. Defendant's motion was granted, and the suppression hearing was reopened on December 21, 2023. ECF Nos. 98, 107.

A report was issued on December 27, 2023, recommending that Defendant's motion to suppress be granted regarding the physical evidence found in the Residence's backyard and denied regarding the physical evidence found inside the Residence and the statements made to the HSI TFOs. ECF No. 110 at 42. The report and recommendation did not ultimately address Defendant's request to suppress the cell phone because

> Defendant was already given an opportunity at the beginning of the hearing to specifically address which items he sought to suppress. . . . Moreover, as previously explained on the August 15 suppression hearing, allowing Defendant to add items—after the initial motion to suppress has already been filed—does not provide the Government with adequate notice.

ECF No. 110 at 6. On February 8, 2024, the court issued an opinion and order adopting the report and recommendation's factual findings, recommendation regarding the black fanny pack found in the Residence's backyard, and recommendation regarding the rifle and ammunition found inside one of the Residence's bedrooms. ECF No. 117 at 2, 24. In other words, the court held that the contents inside the black fanny pack be suppressed and the rifle and ammunition not be suppressed. The court, however, rejected the recommendation regarding Defendant's statements made to the HSI TFOs and granted Defendant's motion concerning said statements. ECF No. 117 at 24.

---

[1] Said motion, however, did not refer to a cell phone. *See generally* ECF No. 80.

Pending before the court is Defendant's second motion to suppress. ECF No. 121. The United States of America ("the Government") subsequently filed a response in opposition to Defendant's motion to suppress to which, thereafter, Defendant replied. ECF Nos. 127–28. Defendant seeks to suppress evidence stemming from the seizure of his cellular phone, arguing violations of his Fourth Amendment rights and making a challenge under *Franks v. Delaware*, 438 U.S. 154 (1978). ECF No. 121 at 3–4, 9. No further suppression hearing was held in light of the fact that the record has been adequately developed throughout four days of hearings to rule on Defendant's second motion to suppress. Moreover, neither parties' briefings point to new evidence suggesting that another hearing is warranted. For the reasons set forth below, Defendant's second motion to suppress should be DENIED.

## II.   FACTUAL BACKGROUND

On February 14, 2023, at approximately 3:00 a.m., the Puerto Rico Police Department ("PRPD") executed an arrest warrant at the Residence to arrest Defendant. Tr. (8/21/23) 12, ¶¶ 12–14; Tr. (8/21/23) 11, ¶¶ 1–11. PRPD's Special Arrest Unit, led by Sergeant Rafael Gómez Águila ("Sgt. Gómez Águila"), conducted a forced entry and began sweeping the Residence's first floor. Tr. (8/15/23) 53, ¶¶ 14–17; Tr. (8/15/23) 54, ¶¶ 2–11. Agent Luis Alexander Gómez ("Agent Gómez"), from the PRPD's Caguas Drugs Division, testified that right before the Special Arrest Team entered the Residence, he saw a silhouette of a person from one the Residence's second-floor windows, and Agent Gómez immediately began to move toward the Residence's backyard. Tr. (8/21/23) 15, ¶¶ 4–14; Tr. (8/21/23) 16, ¶¶ 10–16; Tr. (8/21/23) 17, ¶¶ 1–5. As Agent Gómez reached the back, he allegedly observed Defendant throw a black fanny

pack from the Residence's back door approximately ten feet away.[2] Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/21/23) 22, ¶¶ 8–9. Agent Gómez further testified that, thereafter, Defendant supposedly went back into the Residence, and the black fanny pack remained untouched where it landed.[3] Tr. (8/21/23) 21, ¶¶ 2–7; Tr. (8/21/23) 23, ¶¶ 15–25; Tr. (8/21/23) 24, ¶¶ 1–4.

After clearing the Residence's first floor, the Special Arrest Unit led by Sgt. Gómez Águila proceeded up the stairway to the second floor. Tr. (8/15/23) 55, ¶¶ 5–18. Eventually, both Defendant and his mother, the only occupants of the Residence, were arrested on the second floor. Tr. (8/15/23) 59, ¶¶ 11–17; Tr. (8/15/23) 61, ¶¶ 2–7. Afterwards, Sgt. Gómez Águila and his team started conducting a security sweep of the second floor. Tr. (8/15/23) 61, ¶¶ 2–7. While conducting the sweep, Sgt. Gómez Águila found what appeared to be a rifle in plain sight within a bedroom closet. Tr. (8/15/23) 62, ¶¶ 4–24. Sgt. Gómez Águila, however, did not see a cell phone in the same bedroom where he saw what appeared to be a rifle. Tr. (8/15/23) 94, ¶¶ 19–25.

Once the sweep of the second floor was completed, Sgt. Gómez Águila and his team left the second floor and notified officers from the Caguas Drugs Division that the Residence was clear. Tr. (8/15/23) 66, ¶¶ 19–25; Tr. (8/15/23) 67, ¶¶ 1–3. However, Sgt. Gómez Águila also notified Agent Gómez of the rifle found upstairs in the bedroom closet. Tr. (8/15/23) 67, ¶¶ 2–6. Subsequently, Sgt. Gómez Águila and Agent Gómez, among others, went upstairs, and Sgt. Gómez Águila showed Agent Gómez the closet where the rifle was located. Tr. (8/15/23) 67, ¶¶ 7–11.

---

[2] The Residence's backdoor is on the second floor of the home and had direct access to the backyard. Tr. (8/21/23) 23, ¶¶ 1–14. Although the Residence has two levels, only the second floor has access to the backyard due to the structure of the Residence and its surrounding terrain. ECF Nos. 72-4–11.

[3] During the reopening of the suppression hearing on December 21, 2023, Defendant introduced video recorded evidence that puts into question Agent Gómez's credibility regarding, among other things, the account regarding the silhouette and Defendant being observed throwing a fanny pack to the backyard. Exhibit F (recording of PRPD's breach of Defendant's home).

As Agent Gómez began to observe and examine the rifle discovered by Sgt. Gómez Águila, Agent Gómez noticed the handle of another firearm protruding from a blue backpack. Tr. (8/21/23) 25, ¶¶ 18–25; Tr. (8/21/23) 26, ¶¶ 1–3; ECF Nos. 71-8–10. Agent Gómez proceeded to first check the rifle discovered by Sgt. Gómez Águila and determined it was not real. Tr. (8/21/23) 28, ¶¶ 6–19. Next, Agent Gómez checked the other firearm that was protruding from the blue bag and verified that it was real. Tr. (8/21/23) 28, ¶¶ 23–25; Tr. (8/21/23) 29, ¶¶ 1–3. While Agent Gómez removed the rifle from the blue bag, he observed various types of ammunition within the bag. Tr. (8/21/23) 30, ¶¶ 2–5; Tr. (8/21/23) 31, ¶¶ 2–3. The rifle and ammunition found inside the blue backpack were later inventoried and seized. *See* ECF Nos. 71-13, 71-19. Agent Gómez further testified that he told TFO Edwin Guzmán ("TFO Guzmán"), the case agent, that two cell phones were also seized: one found inside Defendant's pants and the other on the bed of the bedroom where the rifle and ammunition were found (hereinafter, the "Bedroom"). Tr. (8/29/23) 51–52, 74; *see also* ECF Nos. 72-16–17 (displaying the Bedroom).

III.   **ANALYSIS**

Defendant contends that his Fourth Amendment rights were violated when the PRPD seized his cell phone (allegedly found on a bed) without a warrant and that he is entitled to a *Franks* hearing. ECF No. 121 at 3–4, 9. The Government responds, asserting that Defendant waived his right to suppress the cell phone and that the seizure of the phone was valid under the following exceptions to the warrant requirement: search incident to arrest, exigent circumstances, and plain view. ECF No. 127 at 1. Additionally, the Government argues that Defendant has not met his burden for a *Franks* hearing and that the search of the phone was conducted in good faith. ECF No. 127 at 1.

### A. Waiver

The Government claims that Defendant waived his opportunity to suppress the cell phone by failing to raise that issue in his first motion to suppress. ECF No. 127 at 2. During a status conference on February 29, 2024, after the court had already ruled on Defendant's first motion for suppress, Defendant informed the court about the possibility of filing another motion to suppress regarding the seizure of a cell phone. ECF No. 120. The court gave Defendant until March 15, 2024, to file a second motion to suppress to which Defendant complied. ECF Nos. 120–21. Therefore, Defendant's second motion to suppress will be addressed on the merits despite the fact that Defendant could have raised this matter in his original motion to suppress evidence.

### B. Fourth Amendment Claim Regarding the Cell Phone's Seizure

Defendant asserts that the seizure of his cell phone violated the Fourth Amendment and that no exceptions to the warrant requirement exist to justify it. ECF No. 121 at 4; ECF No. 128 at 1–2. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Davis v. United States*, 564 U.S. 229, 234–35 (2011). In analyzing reasonableness, a search "conducted outside the judicial process, without prior approval by judge or magistrate, [is] *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal quotations omitted)). "[W]hen it comes to the Fourth Amendment, the home is first among equals. . . . and is where 'privacy expectations are most heightened.'" *Florida. v. Jardines*, 569 U.S. 1, 6–7 (2013) (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). If the prosecution seeks to justify the search of a home without a search warrant, it bears

6

the burden of establishing that an exception to the warrant requirement applies. *United States v. Jeffers*, 342 U.S. 48, 51. (1951) (citing *McDonald v. United States*, 335 U.S. 451, 456 (1948)). Before addressing the parties' Fourth Amendment arguments concerning the seizure of the cell phone, the issue of where exactly the cell phone was found will be addressed.

### 1. Agent Gómez's credibility determination regarding the location of the cell phone.

Agent Gómez's testimony indicates that two phones were seized inside of the Residence: one inside Defendant's pants and the other inside the Bedroom on top of the bed.[4] *E.g.*, Tr. (8/29/23) 52, ¶¶ 1–5. The parties dispute whether a cell phone was actually found on the Bedroom's bed.[5] The Government, relying on Agent Gómez's testimony, claims that the cell phone was first spotted and seized from on top of the bed. ECF No. 127 at 6. Defendant, highlighting other evidence in the record, contends that the cell phone was not on the bed when it was seized. ECF No. 121 at 6–9. Defendant first points to Sgt. Gómez Águila's testimony that he did not see a cell phone in the Bedroom while he was conducting his security sweep after Defendant was arrested. ECF No. 121 at 2. This testimony, however, does not necessarily confirm that there was no cell phone on the bed because, as explained by Sgt. Gómez Águila, his focus while conducting the sweep was searching for people who could harm his team. Tr. (8/15/23) 94 ¶¶ 19–25; Tr. (8/15/23) 90, ¶¶ 16–20. It is reasonable that Sgt. Gómez Águila missed seeing a cell phone on the bed because in the rush of the moment, his vision could have been fixated on areas where people could have been hiding, such as under the bed or in the closet.

---

[4] To be precise, as previously indicated, Agent Gómez's testimony is that *he told* TFO Guzmán that one cell phone was found in Defendant's pants and the other on the Bedroom's bed. *E.g.*, Tr. (8/29/23) 52, ¶¶ 1–5.
[5] The parties do not contest whether a cell phone was found on Defendant's person.

Defendant next emphasizes Exhibits D3 (ECF No. 72-16) and D4 (ECF No. 72-17), photographs showing the Defendant sitting on the Bedroom's bed with his hands restrained behind his back. ECF No. 121 at 5–6. Because no cell phone can be seen on the bed in the photographs, Defendant reasons that these photographs demonstrate that the cell phone was not on the bed. ECF No. 121 at 6. However, these photographs do not settle the question, as it is plausible that the cell phone was recovered on the bed before the photographs were taken. ECF No. 127 at 7.

Even so, other evidence that Defendant cites strongly contradicts Agent Gómez's claim that the cell phone was discovered on the Bedroom's bed. First, Agent Gómez indicated that all the items shown in Exhibit 7 (ECF No. 71-13)—which includes a cell phone—were found inside the blue backpack in the Bedroom's closet. Tr. (8/29/23) 44, ¶¶ 12–18. Second, while testifying about Exhibit 6 (ECF No. 71-11), which displays a cell phone alongside the rifle in the blue backpack, Agent Gómez conceded that there was a cell phone inside the blue backpack. Tr. (8/29/23) 51, ¶¶ 11–18. When confronted about the inconsistencies in his testimony regarding the location of the cell phone on cross-examination, Agent Gómez stated that he could not remember:

> Q [Defendant's Counsel] So, when you told [TFO] Guzm[á]n that [the cell phone] was recovered from the bed, that was incorrect.
>
> A [Agent Gómez] The thing is that there were two phones.
>
> Q Right, there was a black Samsung phone that was recovered from [Defendant's] person or at least that's what you told [TFO] Guzm[á]n.
>
> A Can you repeat again, excuse me.
>
> Q Well, you told [TFO] Guzm[á]n on February 14, 2023 that you recovered one cell phone from [Defendant's] pants and you recovered another cell phone from on top of the bed where he was sitting.

A Correct.

Q It's fair to say that this cell phone that's in this [blue backpack] is not the phone that you recovered from [Defendant's] pants.

A I don't remember.

Tr. (8/29/23) 51, ¶¶ 19–25; Tr. (8/29/23) 52, ¶¶ 1–9. It would be nonsensical for PRPD officers to find a cell phone on either Defendant's person or the bed and then place it in the blue backpack along with other evidence to take a photograph. Furthermore, even if Agent Gómez were to testify that the cell phone in the blue backpack shown in Exhibit 6 (ECF No. 71-11) was the cell phone found in Defendant's pants, that claim would be met with skepticism because he was given an opportunity to clarify this in at the August 29, 2023, hearing but stated that he could not remember. Hence, Agent Gómez's claim that a cell phone was found on the bed is not credible. Instead, the second cell phone (i.e., as opposed to the first cellphone found in the pants) was found inside the blue backpack along with the rifle and ammunition originally recovered from the Bedroom's closet. Whether any exceptions to the search warrant requirement justified the seizure of the cell phone in the blue backpack will now be addressed.

**2.  Whether the search incident to arrest exception applies.**

The Government contends that the search incident to arrest exception applies because the seizure of the phone was conducted within the timespan of the arrest. ECF No. 127 at 6. The search incident to arrest exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant*, 556 U.S. at 338. In *Chimel v. California*, the United States Supreme Court held that the search incident to arrest exception applies only to items on "the arrestee's person and the area . . . in which [the arrestee] might gain possession of a weapon or destructible evidence." 395 U.S. 752, 763 (1969). A lawful search incident to arrest must be substantially contemporaneous with the arrest because of "the need to

seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime." *Id.* at 764. In the context of cell phones, one "may be seized incident to an arrest [to prevent destruction of evidence], but a warrant is required in order to search it." *United States v. Olivera*, No. CR 21-12, 2022 WL 3334607, at *9 (D.P.R. Aug. 12, 2022) (citing *Riley v. California*, 573 U.S. 373, 403 (2014); *United States v. Henry*, 827 F.3d 16, 28 (1st Cir. 2016)).

Defendant was arrested on the Residence's second floor, which is composed of an "L" shape hallway, made up of the rear-side hallway and the bedroom-side hallway. ECF No. 76-1. Specifically, Defendant was arrested in the rear side, which is the part of the hallway directly accessible from the top of the Residence's stairs. Tr. (8/15/23) 82, ¶¶ 8–15; Tr. (8/15/23) 83, ¶¶ 7–10. Connected at the end of the rear side is the bedroom-side hallway. Tr. (8/15/23) 88, ¶¶ 12–17; ECF No. 76-1 at 1. The bedroom side contains the four rooms of the Residence, with the Bedroom at issue being the first door on the left of the bedroom-side hallway. Tr. (8/15/23) 89, ¶¶ 7–25.

During the execution of the arrest warrant, Defendant was first spotted by PRPD officers when Sgt. Gómez Águila and his team reached the top of the stairway into the Residence's second floor rear-side hallway. Sgt. Gómez Águila observed Defendant running from the Residence's backdoor and away from arresting officers, toward the bedroom-side hallway leading to the Residence's bedrooms. Tr. (8/15/23) 58, ¶¶ 11–25; Tr. (8/15/23) 88, ¶¶ 12–17. As Defendant turned the corner into the bedroom-side hallway, PRPD officers lost sight of Defendant for approximately ten seconds and began issuing commands for him to return to the rear-side hallway. Defendant then complied and returned to the rear-side hallway, where he was arrested. Tr. (8/15/23) 59, ¶¶ 1–22; Tr. (8/15/23) 82, ¶¶ 8–15; Tr. (8/15/23) 83, ¶¶ 7–10; Tr.

(8/15/23) 88, ¶¶ 12–17. The cell phone at issue, however, was in the blue backpack within the Bedroom's closet when Defendant was arrested. Due to the bend in the hallway, the Bedroom— and therefore its closet containing the blue backpack—was not visible from Defendant's location of arrest. *See* Tr. (8/15/23) 58–60.

The Government cites several cases from outside this circuit and declares that "[m]any courts 'have recognized that even when an arrestee is handcuffed, a search of the area that was within the defendant's immediate control when he was arrested is valid so long as it is conducted within a time span close to the arrest . . ." ECF No. 127 at 5 (citations omitted). The Government's argument, however, falls short because it fails to articulate how the cell phone was within Defendant's immediate control when he was arrested, especially where neither the Defendant nor the arresting officers had line of sight to the closet holding the cell phone at the time of the arrest.

The Government further contends that the PRPD was justified in seizing the cell phone incident to Defendant's arrest because he was eventually brought into the Bedroom where the phone was found. ECF No. 127 at 6. The Government cites to several cases in support of this argument, none of which are analogous to the instant case. ECF No. 127 at 5. First, it cites to *United States v. Massenberg*, 45 F. App'x 115 (3d Cir. 2002). In *Massenberg*, the Third Circuit Court of Appeals upheld a search incident to arrest when the evidence seized was found in the same bedroom where the defendant was arrested. *Massenberg*, 45 F. App'x at 119–20. Because Defendant was arrested outside of the Bedroom, the Government's reliance on *Massenberg* is unfounded.

Second, the Government cites to *United States v. Turner*, 926 F.2d 883 (9th Cir. 1991). In *Turner*, officers arrested the defendant when they encountered him on a bed in a bedroom.

*Turner*, 926 F.2d 883 at 886. The arresting officers then removed the defendant from the bedroom and returned to conduct a search of the bedroom. *Id.* On the same bed where Defendant was initially intercepted, officers found and seized cocaine. *Id.* at 888. On appeal, the Ninth Circuit Court of Appeals upheld the search pursuant to the search incident to arrest exception, reasoning that law enforcement's action in removing the defendant from the bedroom was not unreasonable. *Id.* The Government's reliance on *Tuner* also misses the mark because unlike in *Turner*, Defendant was arrested outside of the Bedroom.

Third, the Government cites to *United States v. Abdul-Saboor*, 85 F.3d 664 (D.C. Cir. 1996). In *Abdul-Saboor*, officers went to the home of a defendant to arrest him pursuant to a bench warrant. *Abdul-Saboor*, 85 F.3d at 666. During the execution of the warrant, officers encountered the defendant at the front door of his apartment in a bathrobe and allowed him to enter his bedroom to change clothes. *Id.* After the defendant entered his bedroom, the officers observed him picking up a handgun and attempting to hide it in front of his body. *Id.* The officers then handcuffed the defendant and seated him in a chair approximately four feet outside of the bedroom hallway. *Id.* They then returned to the bedroom to seize the weapon that the defendant grabbed before his arrest, and in doing so, the officers discovered other weapons and drugs. *Id.* On appeal, the District of Columbia Circuit Court of Appeals upheld the officers' search under the search incident to arrest exception, explaining that the defendant's arrest did not end when officers initially confronted him at his apartment's door but instead once he was handcuffed and seated outside of the bedroom. *Id.* at 669.

While the defendant's arrest in *Abdul-Saboor* concluded outside of the bedroom, like Defendant's arrest, this case is still inapposite. Here, unlike in *Abdul-Saboor*, no evidence suggests that Defendant was inside the Bedroom immediately before the arrest. While PRPD

officer's lost sight of Defendant before he was arrested, without more, it would be speculative to find that Defendant was inside the Bedroom in the ten seconds that PRPD officers lost sight of Defendant. Moreover, unlike the case at hand where Defendant was brought into the Bedroom after his arrest, the defendant in *Abdul-Saboor* was removed from the bedroom during the execution of his arrest.

Finally, the Government points to *United States v. Hudson*, 100 F.3d 1409 (9th Cir. 1996). In *Hudson*, officers executed an arrest warrant against the defendant in his parent's home. *Hudson*, 100 F.3d at 1413. Once inside the home, officers began conducting a security sweep of the rooms of the home. *Id.* The officers eventually located the defendant standing in a corner of one of the bedrooms and ordered him out, handcuffed him, removed him from the house, and continued their sweep. *Id.* After the sweep was completed, approximately three minutes later, an officer returned to the bedroom where the defendant was initially found to conduct a search. *Id.* In said bedroom the officer found, among other things, a rifle case on the floor near where the defendant was initially standing. *Id.* On appeal, the defendant argued that the officer's search of the rifle case exceeded the scope of a search incident to arrest. *Id.* at 1418. The Ninth Circuit Court of Appeals disagreed and upheld the search because, *inter alia*, an officer saw the rifle case at the defendant's feet when he was first spotted by officers. *Id.* at 1420. *Hudson* is also distinguishable from the instant action because PRPD officers did not see Defendant in the Bedroom near the cellphone before or during his arrest.

In sum, the cases that the Government cites do not further its contention because all of them deal with situations where the defendants were either arrested in the bedroom where evidence was found or seen in the bedroom where evidence was found immediately prior to the arrest. Moreover, the cases where officers move a defendant to a different location after his arrest

involve removing the defendant from the bedroom where evidence was later found. In this case, to the contrary, the PRPD moved Defendant to the Bedroom where the cell phone was found after he was arrested and without knowledge that Defendant was in the Bedroom before his arrest. Hence, the Government cites to no jurisprudence upholding the search incident to arrest exception under these set of facts. Indeed, such a holding could encourage officers to move a defendant to every room in the home after his arrest, even if the defendant was never in those rooms before the arrest, to effectively justify the search of an entire home under the search incident to arrest exception. Accordingly, the search incident to arrest exception does not apply.

### 3. Whether exigent circumstances justify the seizure of the cell phone.

The Government next claims that the seizure of the cell phone was appropriate because of exigent circumstances. ECF No. 127 at 8. Under the exigent circumstances exception to the warrant requirement, "the need 'to prevent the imminent destruction of evidence' has long been recognized as a sufficient justification for a warrantless search." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (citations omitted). The Government first notes that digital media can be easily deleted, often remotely. ECF No. 127 at 8. Even if this statement were true, the Government fails to point to any evidence that the data on Defendant's phone was at risk of being deleted either by an individual in the Residence or remotely. Thus, this argument cannot carry the day. The Government also asserts that at the time of the arrest, PRPD officers did not know who may have had access to the phone. ECF No. 127 at 8. The problem with this argument is that the officers discovered the cell phone in the blue backpack *after* the security sweep had been completed. Consequently, once the officers discovered the cell phone and ultimately seized it, they did in fact know nobody else had access to it because the Residence had already been cleared. Thus, the seizure of the phone cannot be justified by exigent circumstances.

### 4.   Whether the phone was in plain view.

The Government argues that the plain view doctrine applies because the cell phone was found on the bed. ECF No. 127 at 7. "[T]he plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015) (citing *United States v. Sanchez*, 612 F.3d 1, 4–5 (1st Cir. 2010); *United States v. Jones*, 187 F.3d 210, 219–221 (1st Cir. 1999)). "In the 'plain view' context, this means that probable cause exists when the incriminating character of an object is immediately apparent to the police." *Sanchez*, 612 F.3d at 5

While the Government's plain view argument premised on the cell phone being found on the bed is a nonstarter because there was no cell phone found on the Bedroom's bed, that does not end the inquiry. As explained above, the cell phone was found in the blue backpack originally in the Bedroom's closet. Furthermore, Agent Gómez's testimony confirms that the cell phone was inside the blue backpack when he removed the rifle, that is when he first searched the blue backpack:

> Q [Defense Counsel] I'm going to show you what has been entered into evidence as Government Exhibit 6-A [ECF No. 71-12]. *Now, [Agent] G[ó]mez, you recognize this is the moment you removed the rifle from the blue backpack.*
>
> A [Agent Gómez] *Yes*.
>     . . . .
> Q Taking Government 6-A [ECF No. 71-12] from the Elmo, I'm going to show you Government's 6 [ECF No. 71-11]. What about in this picture, do you see a cell phone in this picture?
>
> A Now it's more clear. It's clearly visible.
>
> Q *To be clear, that phone is inside of the blue bag.*
>
> A *Yes, correct.* . . .

Tr. (8/29/23) 50, ¶¶ 15–19 (emphasis added); Tr. (8/29/23) 51, ¶¶ 11–16 (emphasis added).[6] The photographic evidence and Agent Gómez's testimony confirms that the cell phone was or became readily apparent at the time Agent Gómez removed the rifle from the blue backpack. On these circumstances, the cell phone was in plain view.

Agent Gómez was lawfully in the Bedroom following the Special Arrest Unit's security sweep of the Bedroom where Sgt. Gómez Águila discovered a "rifle" in the closet and notified Agent Gómez about it. Furthermore, Agent Gómez was justified in opening the blue backpack because he observed another rifle inside of it while examining the "rifle" found by Sgt. Gómez Águila. In opening the blue backpack, the cell phone, as shown in Exhibit 6 [ECF No. 71-11], was readily apparent. Finally, Agent Gómez had probable cause to seize the cell phone because he was serving an arrest warrant related to drug charges and cell phones are "well known tools of the drug trade." *United States v. De La Cruz*, 996 F.2d 1307, 1311 (1st Cir. 1993); Tr. (8/21/23) 7, 9–11. Accordingly, the cell phone was validly seized pursuant to the plain view doctrine.

---

[6] Again, an argument that the cell phone displayed in Exhibit 6 (ECF No. 71-11) was the cell phone found on Defendant's person would not make sense because that would effectively entail that the arresting officers removed the phone from Defendant's person and placed it inside the blue backpack before taking the photograph. Furthermore, Defendant does not challenge that a cell phone was recovered from his person, nor does he make the argument that three cell phones were seized at the Residence. Indeed, defense counsel's line of questioning on cross-examination of Agent Gómez reasonably suggests that Defendant is of the position that the cell phone in the photograph was not the phone found on Defendant's person:

> Q Well, you told [TFO] Guzm[á]n on February 14, 2023 that you recovered one cell phone from [Defendant's] pants and you recovered another cell phone from on top of the bed where he was sitting.
>
> A Correct.
>
> Q It's fair to say that this cell phone that's in this bag is not the phone that you recovered from [Defendant's] pants.
>
> A I don't remember.
>
> Q But to be clear, this . . . phone is not in [Defendant's] pants in this picture.
>
> A No.

Tr. (8/29/23) 52, ¶¶ 1–12.

**C.** *Franks* **Hearing**

Defendant argues that he has made the preliminary showing for a *Franks* hearing. ECF No. 121 at 9. A defendant is entitled to a suppression hearing under *Franks* if he makes a "substantial preliminary showing" that a false statement or omission in the affidavit in the warrant application "was made knowingly and intentionally or with reckless disregard for the truth" and that the false statement or omission was "necessary to the finding of probable cause." *United States v. Arias*, 848 F.3d 504, 511 (1st Cir. 2017) (quoting *United States v. McLellan*, 792 F.3d 200, 208 (1st Cir. 2015)). Once granted a hearing, the defendant is only entitled to the suppression of evidence obtained under the challenged warrant if he shows by a preponderance of the evidence both (1) "that an affidavit in [the] warrant application contains false statements or omissions, made intentionally or with reckless disregard for the truth," and (2) "that a finding of probable cause would not have been made without those false statements or omissions[.]" *Id.* (citing *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015)).

Defendant has made a showing that Agent Gómez's statement about the cell phone being found on the Bedroom's bed is not true. However, as discussed above, a hearing is not necessary because the record has already been adequately developed over the four days of prior hearings to rule on Defendant's *Franks* challenge outright. Here, TFO Guzmán submitted an application for a search warrant of the cell phone and affidavit in support of said application to the court on April 18, 2023—approximately two months after the seizure of the cell phone on February 14, 2023. ECF No. 121-2 at 1, 12; ECF No. 1-1 at 1, 12 in Case No. 23-413 (M). The affidavit contains only two statements regarding the location of the cell phone:

> The other cellphone (the DEVICE) was found on top of the bed of the bedroom where the rifles were found.
>      . . . .

> The Device was found on top of the bed in the room where the rifles were found
> during a security swee[p] of the TARGET RESIDENCE.

ECF No. 121-2 at 5, 7; ECF No. 1-1 at 5, 7 in Case No. 23-413 (M). Because it has been

determined that the cell phone was found in the blue backpack inside the Bedroom closet, not on

top of the Bedroom's bed, portions of the statements above are false.[7] However, the portions of

each statement noting that the cell phone was found inside the Bedroom are true. TFO Guzmán

was not present at the Residence during Defendant's arrest and the seizure of evidence. Tr.

(8/29/23) 86, ¶¶ 23–24. Moreover, the record indicates that Agent Gómez was the only person at

the Residence to have claimed that the cell phone was found on the bed. Hence, a reasonable

inference could be drawn that the statements regarding the cell phone's location in TFO

Guzmán's affidavit originate from Agent Gómez.

Defendant contends that the false statements were made with reckless disregard for the

truth because the photographs at the arrest scene put into question Agent Gómez's claim that the

phone was found on the bed. ECF No. 128 at 8–9; ECF No. 121 at 10. Based on all the

photographic evidence in the record, only two distinct photographs display a cell phone. The

first, Exhibit 7 (ECF No. 71-13), shows the blue backpack that was found in the Bedroom's

closet along with the rifle and ammunition found therein, all spread out on top of the Bedroom's

bed. The cell phone, alongside the rifle and ammunition, is also on the bed. ECF No. 71-13.

Because it is certain that the ammunition and rifle were found in the blue backpack in the

Bedroom's closet, this photograph alone reasonably suggests that the cell phone was also found

in the blue backpack, not on the bed as alleged by Agent Gómez.

---

[7] Moreover, the cell phone was found inside of the blue backpack within the Bedroom's closet after the security
sweep was conducted. Thus, it is inaccurate to say that the cell phone was found during the security sweep.

The second photograph, Exhibit 6 (ECF No. 71-11), bolsters this conclusion. Exhibit 6 shows what appears to be the cell phone in the blue backpack. ECF No. 71-11. A review of both photographs would make a reasonable officer question Agent Gómez's account on the location of the cell phone, not only because the photographic evidence does not support Agent Gómez's claim but also because it cuts against it. Thus, TFO Guzmán acted in reckless disregard for the truth by either failing to review the photographic evidence altogether or by reviewing said evidence and concluding that the phone was on the bed without questioning Agent Gómez.

The Government implies that TFO Guzmán did not have enough time to review the photographic evidence prior to submitting the search warrant because it "often takes time to retrieve." ECF No. 127 at 9. This would be a reasonable argument had TFO Guzmán applied for the search warrant shortly after the cell phone was seized. Instead, TFO Guzmán waited approximately two months after the seizure of the cell phone to submit the search warrant application. Therefore, this contention is untenable because TFO Guzmán had adequate time to review the photographic evidence and question Agent Gómez's account of the cell phone's location. Accordingly, Defendant has shown that the false portions in the statements made in TFO Guzmán's affidavit to support the search warrant application for the cell phone were made with reckless disregard for the truth.

Defendant contends that if the statements (as shown above) containing false portions are removed in their entirety from the search warrant affidavit, then the affidavit is devoid of any information regarding where in the Residence the cell phone was found and seized. Without a reliable location of the cell phone's seizure, Defendant argues, there is no probable cause to link the cell phone to being evidence of a crime. ECF No. 121 at 10. The problem with this argument is that Defendant is asking the court to remove the statements in their entirety, not solely what is

false. Contrary to Defendant's argument, even if the false portions of each statement are removed, the statements still assert that the cell phone was found in the Bedroom (i.e., the same room where the rifle was found):

> The other cellphone (the DEVICE) was found ~~on top of the bed of~~ the bedroom where the rifles were found.
>     . . . .
> The Device was found ~~on top of the bed~~ in the room where the rifles were found ~~during a security swee[p]~~ of the TARGET RESIDENCE.

ECF No. 121-2 at 5, 7; ECF No. 1-1 at 5, 7 in Case No. 23-413 (M).

Here, the search warrant authorized was related to firearms offenses. ECF No. 121-3 at 4. Furthermore, TFO Guzmán's affidavit states that

> [t]hrough training and experience, I have become familiar with the *modus operandi* of drug traffickers, local gangs and criminals that are involved in drug *and weapons trafficking* and other crimes of violence *and their methods of communication and storage of information, which include the use of cellular telephones* and other electronic devices.

ECF No. 121-2 at 2, ¶ 4 (emphasis added). Thus, even when the false *portions* of the statements are removed, a finding of probable cause still exists to justify the search of the cell phone. It is reasonable that a cell phone found in the same room as weapons would be evidence of a crime, regardless of whether the phone is on a bed, in a backpack or in a closet of that room. Thus, Defendant has failed to meet his burden with respect to his *Franks* challenge. Because the cell phone was searched pursuant to a valid warrant, the Government's good faith argument need not be considered.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (ECF No. 121) should be DENIED. The cell phone and its contents should not be suppressed. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by

the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 23rd day of May, 2024.

s/Marcos E. López
U.S. Magistrate Judge